608 So.2d 1227 (1992)
POTTERS II, a Mississippi General Partnership, Owner; Westinghouse Credit Corporation, Beneficiary; Robert R. O'Conner, Trustee; and U.S. West Financial Services, Inc., Possible Assignee Beneficiary
v.
STATE HIGHWAY COMMISSION OF MISSISSIPPI.
No. 90-CC-1096.
Supreme Court of Mississippi.
August 26, 1992.
*1229 Newt P. Harrison, James L. Halford, Brunini Grantham Grower & Hewes, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Henry C. Clay, III, Sp. Asst. Atty. Gen., John H. Price, Jr., Barry S. Zirulnik, Thomas Price Alston Jones & Davis, Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and McRAE, JJ.
ROBERTSON, Justice, for the Court:

I.
This eminent domain case presents discrete questions concerning the legal contours of what is being taken, and its value, and damage to the remainder. Landowner operates a nationally franchised fast food restaurant. It presses to add the going-concern value of its particular business to the "before" value of the taking. It claims as well, under guise of damage to the "remainder," for personal property trade fixtures and equipment it has removed from the premises.
The Court below rejected the plea but was quite generous in allowing Landowner's appraiser to give value based thereon. The jury gave a not insignificant award of $503,000.00. The Hinds County Special Court of Eminent Domain rejected Landowner's plea for an additur. We affirm.

II.
Potters II is a Mississippi general partnership with two general partners  William L. (Bill) Hall of Brandon, Mississippi, and Frank McComas of Columbia, South Carolina. Hall and McComas formed the partnership around 1981 and have become a local franchisee of Burger King Corporation, operating seven Burger King fast food restaurants in the Greater Jackson area  Brandon, Richland, Pearl and, most recently, Clinton. Hall is the managing partner.
In 1987, Potters II began plans to open a Burger King in Clinton. Hall found what he considered an ideal location, an unimproved 1.104 acre parcel of land just off a major interchange on Interstate Highway 20, some 700 feet north of the Springridge Road Exit. The property had a frontage of 169 feet on the east side of Springridge Road and was originally some 300 feet deep.[1] After obtaining approval from the Burger King Corporation, Potters II bought the land for $165,000.00 and spent $434,448.00 more to complete the building. Potters II's Clinton, Mississippi, Burger King opened for business in February of 1988.
Potters II was protected from the eventuality which has come to pass. Its Burger King Restaurant Franchise Agreement includes:
If the loss of possession is the result of governmental exercise of eminent domain, franchisee may with BKC's consent and subject to availability relocate to other premises in the same market *1230 area for the balance of the term of this agreement.
It is undisputed that Burger King's real estate division assists franchisees in obtaining new locations under such circumstances. The importance of all this will presently appear.
Not too long after the new Burger King sold its first Whoppers, the Mississippi State Highway Commission (MSHC) decided it needed a substantial portion of the frontage of subject property. On December 28, 1989, MSHC formally commenced the present proceedings by filing its complaint in the County Court of Hinds County, taking for public use .353 acres (15,387.9 sq. ft.) on the west side of subject property, "including in their entirety the improvements located partially on the lands ... [being taken] and partially on ... [Potters II's] remaining land." MSHC made the taking for highway right-of-way purposes in order to improve and upgrade Interstate Highway No. 20, including the construction of four new ramps connecting I-20 to Springridge Road, and the reconstruction and widening of Springridge Road. Also named as a party defendant was U.S. West Financial Services, Inc., assignee-mortgagee under a recorded deed of trust.[2]
After several pre-trial hearings relating to discovery motions and motions in limine, trial commenced July 12, 1990. MSHC presented its staff appraiser, Michael Pritchard, who offered his opinion that before the taking, subject property had a fair market value of $608,900.00 and that, after the taking, it was worth some $179,900.00, for a net compensation due of $429,000.00. Potters II's expert valuation witness, James V. Davis, Jr., had a different view. Davis told the jury subject property had a "before" value of $1,135,000.00 and an "after" value of $210,000.00, with due compensation fixed at $925,000.00. The jury was not buying but awarded Potters II a not immodest $503,000.00.
Potters II moved for an additur or, in the alternative, a new trial on damages. The Court denied the motion. Potters II now appeals to this Court.

III.

A.

The Constitution of this state provides: Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, ... .
Miss. Const. Art. 3, § 17 (1890). It becomes important to remember the Constitution commands due compensation for property taken "or damaged." Parker v. State Highway Commission, 173 Miss. 213, 162 So. 162 (1935), reminds us the words "or damaged" were added to the Constitution to secure a private property owner for damages not covered by the actual taking. Parker, 173 Miss. at 219, 162 So. at 163.
Notwithstanding, we have never held compensable every diminution of value. Zoning laws and the authority to place public projects are familiar sources. "Many exchangeable values may be destroyed intentionally without compensation,"[3]Dycus v. Sillers, 557 So.2d 486, 497 (Miss. 1990), quoting International News Service v. Associated Press, 248 U.S. 215, 246, 39 S.Ct. 68, 75, 63 L.Ed. 211, 223 (1918) (Holmes, J., concurring); see also, City of Gulfport v. Anderson, 554 So.2d 873, 874 (Miss. 1989); Mississippi State Highway Commission v. Ladner, 243 Miss. 139, 145, 137 So.2d 791, 793 (1962); but see, Gilich v. Mississippi State Highway Commission, 574 So.2d 8, 12 (Miss. 1990). Nor have we settled where the line ought be drawn. For the moment, takings are (de)limited by law which may or may not include all values  matters of fact. Value is the measure of due compensation attendant upon a taking or damage previously and independently defined by law. In a given case, subject to legal parameters, what is taken *1231 is a function of the complaint filed by the condemning authority. And the same of what damage is compensable.
Taking defined, we seek value and damage. Both "before" and "after", we seek fair market value, which is a value in exchange. The canonical definition is
the most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 43 (10th Ed. 1992) (hereinafter "AIREA, The Appraisal of Real Estate, ____"). One formulation familiar in this state is, the sales price that would be negotiated between knowledgeable and self-interested persons, one who wants to purchase and one who wants to sell, the seller being under no obligation or compulsion to sell, and the buyer being under no necessity of having the property.[4]See, e.g., Crocker v. Mississippi State Highway Commission, 534 So.2d 549, 552 (Miss. 1988); Mississippi State Highway Commission v. Havard, 508 So.2d 1099, 1100 (Miss. 1987); Bear Creek Water Association, Inc. v. Town of Madison, 416 So.2d 399, 401 (Miss. 1982); Mississippi State Highway Commission v. Wagley, 231 So.2d 507, 509 (Miss. 1970).
This Court has long respected the appraisal profession's judgment that fair market value is an opinion best formed by competent persons pursuing not just one, but three separate and distinct but nevertheless interrelated, approaches to value: the cost approach, the market data or sales comparison approach, and the income approach. See AIREA, The Appraisal of Real Estate, 79-81; and, thereafter, Rebelwood, Ltd. v. Hinds County, 544 So.2d 1356, 1360-62 (Miss. 1989); Crocker v. Mississippi State Highway Commission, 534 So.2d at 553; Trustees of Wade Baptist Church v. Mississippi State Highway Commission, 469 So.2d 1241, 1244 (Miss. 1985).
Here we have a partial taking. By its complaint, MSHC is taking.353 acres of the front of subject property, plus all improvements and fixtures wherever located. Our rule has been settled for at least half a century,
[W]hen part of a larger tract of land is taken for public use, the owner should be awarded the difference between the fair market value of the whole tract immediately before the taking, and the fair market value that remained immediately after the taking, without considering general benefits or injuries resulting from the use to which the land taken is to be put, that are shared by the general public.[5]
Mississippi State Highway Commission v. Hillman, 189 Miss. 850, 866, 198 So. 565, 569 (1940); Mississippi State Highway Commission v. Havard, 508 So.2d at 1101; see also, e.g., Sanderson Farms, Inc. v. *1232 Mississippi State Highway Commission, 324 So.2d 243, 244 (Miss. 1975); and New v. Mississippi State Highway Commission, 297 So.2d 821, 823 (Miss. 1974); Muse v. Mississippi State Highway Commission, 233 Miss. 694, 718, 103 So.2d 839, 849 (1958).
Subject property is commercial property by any standard. Commercial properties are bought and sold because of their income-producing capacity. Their value is in large part a function of the earnings one might reasonably expect from prudent use, and so future profitability is a major factor our knowing and willing buyer and seller will sensibly consider before settling upon a sales price. These unexceptionable premises, unfortunately, tend to confuse the careless mind. Our law commands that we value property and not management nor the particular enterprise that may be there found. Cf. Rebelwood, Ltd. v. Hinds County, 544 So.2d at 1361-62. The value of property in a market exchange is enhanced by a reasonable assessment of future profitability but not, by way of contrast, because present management is efficient, nor is it necessarily depressed because current management may be incompetent. Eminent domain courts searching for value seeks typical, not existing, management and over a reasonable period of time. See Crocker v. Mississippi State Highway Commission, 534 So.2d at 553; Georgia Pacific Corp. v. Armstrong, 451 So.2d 201, 207 (Miss. 1984).
Condemnation cases are not vehicles through which a landowner may seek and recover the value of a business, however thriving, nor the loss of profits he might have made had he retained the property. See, e.g., State Highway Commission of Mississippi v. Smith, 511 So.2d 881, 882 (Miss. 1987); Seago Enterprises, Inc. v. Mississippi State Highway Commission, 330 So.2d 588, 590 (Miss. 1976); Mississippi State Highway Commission v. Central Land & Rental Corp., 239 So.2d 335, 338 (Miss. 1970); Green Acres Memorial Park, Inc. v. Mississippi State Highway Commission, 246 Miss. 855, 153 So.2d 286, 290, 291 (1963); Mississippi State Highway Commission v. McCardle, 243 Miss. 111, 137 So.2d 793, 796 (1962); Mississippi State Highway Commission v. Rogers, 236 Miss. 800, 112 So.2d 250, 252-53 (1959).
The cases Potters II cites are wholly consistent with these views. In Mississippi State Highway Commission v. Stout, 242 Miss. 208, 134 So.2d 467 (1961), landowner was allowed to prove the yield of his pecan orchard. The pecan trees, however, were a part of the property. They had no existence independent of the land. They were improvements to the land in the same legal sense that Potters II's building became a part of the land. The yield of these trees could not be severed and moved to a new location, only destroyed. Mississippi State Highway Commission v. Franklin County Timber Co., Inc., 488 So.2d 782 (Miss. 1986), held proper the jury's considering that the property was used as for sawmill and logging operations in a context where the taking was destroying current use and lowering highest and best use. State Highway Commission v. Meridian Brick Co., 245 Miss. 349, 147 So.2d 302 (1962), is essentially the same.
Bear Creek Water Association v. Town of Madison, 416 So.2d 399 (Miss. 1982), is the other side of today's coin. The taking was not of land but of condemnee's certificate of public convenience and necessity granting it the authority to distribute water. Going concern value was quite relevant because the right to continue in the business was being taken. See also, City of Jackson v. Creston Hills, Inc., 252 Miss. 564, 172 So.2d 215 (1965). Therefore, under the circumstances, it only serves to provide a contrast to make clear the error of Potters II's ways.

B.

1.
Today's appeal finds Potters II in hopeless disagreement with this view. In a dozen ways, Potters II sought at trial to have "the value of Potters II's Burger King restaurant added to the market value of the subject property immediately prior to the taking." [Brief of Appellant, p. 1] And so we are presented claims the County *1233 Court erred in excluding certain justificatory testimony from appraiser Davis, in gagging partner Hall as he sought to enhance the value of his property, in limiting cross-examination of MSHC's valuation expert, and, as well, the phrasing of jury instructions.
In a sense, Potters II's dispute is about highest and best use.[6] In seeking value, we assume that our rational, wealth-maximizing buyer and seller will inform themselves of the profitability of various uses of the property and will trade by reference to the most profitable use. AIREA, The Appraisal of Real Estate, 69-72, 152-169. Oftentimes parties to eminent domain proceedings proceed within broad, general use categories and talk of commercial use and residential use and the like. See, e.g., Howell v. State Highway Commission of Mississippi, 573 So.2d 754, 755 (Miss. 1990); Dykes v. State Highway Commission of Mississippi, 535 So.2d 1349, 1351 (Miss. 1988). On other occasions, not inappropriately, these broad categories are narrowed so that a highest and best use for a given property may be for multi-family residences as distinguished from single-family dwellings, see, e.g., Hudspeth v. State Highway Commission of Mississippi, 534 So.2d 210, 211 (Miss. 1988). Within commercial properties, there are many uses of differing values. Franklin County Timber talks of sawmilling as the most profitable use. We think it fair on the present facts that expert valuation testimony may assume the highest and best use of subject property was as a fast food restaurant. We say this notwithstanding that MSHC Appraiser Pritchard limited himself to the broader characterization: commercial. Obviously, the extent to which the categories are narrowed is a matter of professional judgment and, within limits, experts may give their opinion regarding the appropriate level of specificity.
Potters II bottoms its entire case on the premise that the highest and best use of this property was as a Burger King franchise fast food restaurant and nothing else. For example, when managing partner William Hall said, post-taking, the property could no longer be used for a fast food restaurant, he made clear that this meant Potters II could no longer use it as a Burger King franchise fast food restaurant, and the reason this was so was the drive-thru and parking spaces would be substantially impeded and diminished. Given the Burger King Corporation approved layout and design, there was not enough room left to continue. Neither Hall nor anyone else ever testified the property could not be used as another type of fast food restaurant, and all agreed it was still commercial property.
Potters II's premise is fundamentally flawed, as we have explained in Part III(A). MSHC is not taking the franchise. The Burger King franchise agreement provides Potters II with the right to relocate, and, though Burger King's consent is required, there is not a court in the land that would not hold this a consent that may not unreasonably be withheld. More generally, values attached to a trade name such as Burger King are a function of factors far removed from subject property. We think, for example, of national advertising, of system-wide promotional campaigns, and other marketing stratagems directed from afar, and of the goodwill these and tasty Whoppers may chance to generate. These are values, to be sure, but they are portable values readily severable from the land, and that they are so goes far to explain and justify their exclusion by law from the legally (de)limited taking.

2.
These views before us, we see that the County Court was quite correct when it restricted Potters II's evidence. Most prominent is the evidence appraisal expert Davis proffered. Here, we repeat, Davis was allowed to present his impressive credentials and tell the jury he thought Potters II's property before the taking was worth $1,135,000.00 and after, $210,000.00. The jury well knew Davis thought due compensation equaled $925,000.00. Potters II *1234 is reduced to complaining the Court did not allow Davis to give a full explanation how he formed his opinion.
Davis testified that he followed the appraisal process but that he gave greatest credit to the results of his cost approach and market data approach analyses. In connection with his cost approach, the Court, on MSHC's objection, excluded Davis' testimony regarding three components thereof: franchise fee, start-up costs, and entrepreneurial incentive. These factors excluded, Davis insisted dogmatically he could not use the cost approach to value because without these factors, "It's, in my opinion, not proper appraisal technique and does not represent the market value of the property."[7] Accepting that Davis is the expert and not this Court, we think it apparent that Davis is wrong. He is wrong in the sense that he has forgotten that he is appraising the partial taking, before and after, the contours of which are formed by law and not value.
It requires no great insight to see that Potters II's franchise fee is not a factor that enhances the value of what is being taken, if for no other reason that the franchise agreement gives Potters II the right to move to another location for the remainder of the term of the franchise agreement. It may well be that a knowledgeable and informed buyer would think of start-up costs before buying a commercial property, and this may well be so even if the buyer plans to sell or rent to another. These go to the value of the business, not the property. Davis' approach to start-up costs was more inapt in that he tailored to the particular Burger King restaurant Potters II operated on the subject property.
Without doubt, a valuation expert ought, in working a cost approach to value, estimate and include
an incentive sufficient to induce an entrepreneur to undertake the risk associated with building the project... . The difference between the cost of development and the value of the property after completion is the entrepreneurial profit (or loss) realized.
AIREA, The Appraisal of Real Estate, 319-20. Davis made his computation of the entrepreneurial incentive directly to Potters II's operation of this particular Burger King restaurant. The County Court did not err in excluding Davis' testimony on these three elements of his cost approach.
Davis' market data or sales comparison study suffered the same vice. Rather than seeking comparable sales of commercial properties or even of fast food restaurants, Davis sought sales of Burger King restaurants in the Southeastern United States. He focused upon three involving a total of six properties, five in or near Columbia, South Carolina, and a sixth in Orangeburg. In each of his comparable sales, a successful going concern, together with the franchise itself, was sold along with the land, improvements, fixtures and equipment. Such sales are simply not comparable to today's taking. Notwithstanding, the Court allowed Davis to give his estimate or opinion that the value of the subject property before the taking was $1,135,000.00 and that after the taking the property had a value of $210,000.00, a difference  due compensation  of $925,000.00. There is hardly any error here.

3.
Managing partner Hall's testimony suffers the same infirmities, though he, too, enjoyed considerable latitude. The Court allowed Hall to present his original cost figures, showing how much he paid for the *1235 land, how much it cost to construct the building, etc., in the aggregate sum of $844,765.00, a figure that no doubt included inadmissible costs. Hall wanted to tell the jury that before the taking the property had a value of $1,200,000.00, and that due compensation was $985,000.00. The County Court demurred.
It is settled in eminent domain practice that a landowner may give his opinion of the fair market value of his property. See, e.g., Mississippi State Highway Commission v. Spencer, 209 So.2d 821, 824 (Miss. 1968); Mississippi State Highway Commission v. Magee, 186 So.2d 238, 239 (Miss. 1966). This does not, however, mean the landowner can get on the witness stand and say anything he wants. Properly understood, the rule exempts the landowner from showing that he possesses the qualifications necessary in law to be accepted as an expert witness. See Rule 702, Miss.R.Ev. It proceeds on the premise that the landowner through his ownership has acquired a unique view of the property and that he can and ought be allowed to share this view with the jury. Because landowners ordinarily are not experts and trained in the field of property valuation, we do not hold them to precise modes of articulation of the way in which they arrived at the values they give. Nothing in this rule, however, empowers a landowner to present an opinion based upon legally irrelevant factors.
In the case at bar, Hall's "before" opinion of value  $1,200,000.00  includes some $356,000.00 in value attributable to the value as a going concern of the Burger King business Potters II was operating at the time of the taking. This is made apparent by Hall's repeated insistence that, after the taking, the property would no longer be suitable for a Burger King franchise, primarily because there would remain inadequate space for parking and for his drive-thru business. Hall never testified that the property could no longer be used for a fast food restaurant, and he certainly did not testify the property had no further commercial use. Rather, he insists throughout that his property is no longer suited to the peculiar use of a Burger King restaurant with all of the facilities and services he has theretofore provided.

4.
In a similar vein, Potters II complains it was impermissibly restricted in cross-examining MSHC's valuation expert, Michael Pritchard. The proffered cross-examination is fatally infected as we have been discussing, to-wit: counsel sought to elicit from Pritchard an opinion that the value of the Burger King going concern should be added to the market value of the land and buildings.
Counsel made his proffer in chambers and sees in it a smoking gun.
BY MR. HARRISON: (Continuing)
Q. Mr. Pritchard, we're outside the presence of the jury. Are you telling the jury that if tomorrow Mr. Hall wants to retire or the doctor tells him he's got to leave and he walks away and goes to Missouri or back home to Brandon or wherever he goes, and he comes to you and says Mr. Pritchard, what can I get for this piece of property at 455 Springridge Road, all you're going to tell him he can get is $689,000?
A. I'd have to ask him a question, is he selling the rights to sell the Burger King hamburger? Is he selling those rights with that?
Q. He is walking away from the property.
A. Okay. So in other words he's selling the rights to sell the Burger King hamburger?
Q. He's selling everything he's got out there.
A. Yes, sir, he could get more money for it if he sold those rights.
Q. Thank you, sir.
A. But, the State is not buying those rights.
Q. But they're damaging those rights, are they not?
A. No. sir, they are not damaging the rights.
Q. You don't think they are?

*1236 A. In the agreement they provide for a mutually agreed relocated site to be agreed on by Burger King Corporation and by Potters II. So they are not selling those rights. So he still has the business income coming in provided he relocates in the city of Clinton or in the marketing area.
Q. But, if he wants to go to Arizona and walk away he can sell everything he's got out there for more than $689,000 on December 28, 1989?
A. If he sells the rights to sell the Burger King hamburger?
Q. Yes, sir.
A. Yes, sir.
Q. And that adds value to that property, does it not?
A. Yes, sir. That's correct.
Potters, II's brief makes it clear counsel thinks he has proven his point with this cross-examination. Sensibly read, Pritchard's testimony shows his concession that the "right to sell hamburgers" enhances the value of the property if the Burger King franchise business is being sold along with the land and building all as a going concern. What counsel refuses to accept, and what Pritchard explained quite simply, is that MSHC is neither buying nor damaging the Burger King franchise. The County Court correctly sustained MSHC's objection.

5.
In a final variation on his theme, Potters II complains that the Court, over its objection, granted Jury Instruction No. P-5.[8] This instruction focused the jury on Potters II's loss, not MSHC's gain, but provided as settled law provides, that the jury was not to include loss of future profits nor the value of the business as a going concern. From the cases cited above, this instruction is a correct statement of the law.
The instruction was correct when it precluded juror thought of "the value of the business conducted on said property [and] ... any losses in connection therewith." "The business" conducted on said property is not being taken. As a practical matter, neither "the business" nor "losses in connection therewith" are susceptible of being valued without including the value of the franchise, which is not being taken, and the worth of current management, which is neither unique to the property, nor is it being taken. Our law is settled these matters may enter the case only to the extent they inform our search for highest and best use. The jury was told what  and all  the law allowed when Instruction No. P-2[9] explained the before-and-after rule, emphasizing within the willing buyer/willing seller approach to fair market value that "each ha[s] ... knowledge of the material facts concerning the property" and is "informed of the highest and best use of the property."
Beyond this, Potters II complains that the County Court refused two of its instructions, Instructions Nos. D-7[10] and *1237 D-8.[11] Instruction D-7 addressed the matter of loss of profits and would have told the jury that it could not consider lost profits except insofar as they may "have an effect on fair market value of said property." If the instruction were talking of profitability, in the sense that commercial properties are bought and sold because of their profitability, the matter might have merit. The instruction, however, emphasized profits "which may be derived from business conducted on the property." As explained above, the particular business conducted on the property is neither being taken nor is it a legitimate consideration in evaluation except in the limited sense that it reflects one possible use of the property.
Instruction No. D-8 is another matter. True, it talks of "profits" and the "business being conducted on the property," but, if given, it would have tied the jury's view of these to what the law not only allows but requires: considering these and any other matters to the extent to which they have "an effect on the fair market value of said property." With this limitation, Instruction No. D-8 correctly states the law. A before-and-after rule that "swallows and absorbs" all specific elements of damages, State Highway Commission of Mississippi v. Havard, 508 So.2d 1099, 1101 (Miss. 1987), may not on principle exclude anything that affects before or after value. We find, however, the point covered in the before-and-after and highest-and-best-use instructions, Nos. P-2 and P-4 noted above. We have carefully reviewed the instructions given the jury as a whole and find that the jury was fairly (albeit imperfectly) instructed on all issues before it. In this view, the County Court's failure to grant Instruction No. D-8 does not require reversal. See, e.g., Smith v. Mississippi State Highway Commission, 423 So.2d 808, 813 (Miss. 1982); Mississippi State Highway Commission v. Crooks, 282 So.2d 232, 236 (Miss. 1973); Mississippi State Highway Commission v. Spencer, 209 So.2d 821, 824-25 (Miss. 1968).

IV.
Potters II complains the County Court erred when it refused to allow the jury to consider damages to its personal property, fixtures and equipment as elements of damage to the remainder. At trial, general partner Hall was allowed to tell the jury that Potters II had paid $224,154.00 for restaurant equipment and fixtures. He explained that this equipment consisted of a walk-in cooler, display cases, a frozen food case, a produce display case, booths, tables and chairs  everything down to paper clips, some eighty percent of which was physically attached to the building. Appraiser Davis then offered for the jury's benefit his opinion that, immediately prior to the taking, the fixtures and equipment contributed $260,000.00 to the property's value and that after its removal from the building, it had a salvage value of $17,406.00. Notwithstanding this proof, the Court instructed the jury it could not award compensation for damages to or loss of personal property, trade fixtures and the like.[12]
*1238 At its core, Potters II's argument is that personal property is protected by Section 17 of the constitution, as well as real property, that is, that when the constitution declares private property shall not be taken or damaged for public use without due compensation the word "property" includes all types of property, real, personal and fixed. Potters II cites Commissioners of Homochitto River v. Withers, 29 Miss. 21, 32 (1855), affirmed sub nom. Withers v. Buckley, 61 U.S. (20 How.) 84, 15 L.Ed. 816 (1857), which supports its theoretical premise. There is no reason on principle why personal property ought be held excluded from Section 17. See Bear Creek Water Association, Inc. v. Town of Madison, 416 So.2d 399 (Miss. 1982).
What is wrong with the argument is, however sound its background theory, the fixtures and equipment at issue are simply not within the scope of this case. All agree that MSHC is not taking the fixtures and equipment. Potters II is allowed to keep them, and it is never explained in the record that they are not usable in a future Burger King restaurant Potters II may establish. More important, these fixtures and equipment are not a part of the "remainder," either. Not only are they severable, they have been severed. Where, as here, the fixtures and equipment are as usable after the taking as before and where the owner voluntarily removes them, he is not entitled to compensation or damages. 2 Nichols, The Law of Eminent Domain, § 5.47[1] (rev. 3d ed. 1990). The fixtures and equipment here at issue are not in law a part and parcel of the property which remains after the partial taking.
This is not to say these fixtures and equipment may not, in fact, have suffered a diminution in value. An appropriate analogy might be found if, next door or behind subject property, Potters II owned another parcel or tract (put to whatever use). It might well be that the partial taking of subject property would, in fact, have an adverse effect on the market value of the adjoining property, but that would not become a compensable value within this eminent domain proceeding. This is but another instance of the premise that the Constitution does not protect every value.
In its brief, Potters II asserts a number of cases and says they have recognized damages to personal property in legally analogous settings. See, e.g., Mississippi State Highway Commission v. Rives, 271 So.2d 725 (1972); Mississippi State Highway Commission v. McArn, 246 So.2d 512, 514-15 (Miss. 1971); Mississippi State Highway Commission v. Central Land & Rental Co., 239 So.2d 335, 337-38 (Miss. 1970); Mississippi State Highway Commission v. Rogers, 242 Miss. 439, 136 So.2d 216, 217-18 (1961). These were relocation cases, in which damages were awarded for moving costs incident to removing the fixtures from the premises and locating them in a new building. It is important to realize that in 1972 the legislature acted to formalize its protection of landowners whose businesses were taken in whole or in part and to assist them in relocation expenses. See Relocation Assistance Act, Miss. Code Ann. § 43-39-1, et seq. (1972), an enactment substantially amended and updated in 1989, see Miss. Laws ch. 421 (1989). Potters II, however, eschews presentation of a claim under this act, but instead pursues doggedly its view that the fixtures and equipment were part of the remainder and the cause damaged subject to inclusion in the jury's award. In law they were not.

V.
Potters II urges that the County Court erred when it refused to allow the jury to consider U.S. West Financial Services, Inc.'s interest in subject property. U.S. West had financed the original construction *1239 and start-up of the business and at the time of the taking, held a deed of trust on the property, the original principal balance of which was $845,415.36. As of the date of the taking, Potters II still owed U.S. West $751,649.24 in principal and $7,055.42 in interest, for a total of $758,704.66. Potters II and U.S. West proffered the deed of trust into evidence, and, when they did so, the Court ordered the amount of the original principal indebtedness stricken. Otherwise, the deed of trust was admitted.
This state accepts the unit valuation rule and under that rule, separate interests or estates in property are inextricably bound to each other. It is proper for all parties with an interest in the property to be made parties to an eminent domain proceeding. Lennep v. Mississippi State Highway Commission, 347 So.2d 341 (Miss. 1977). Citing Evans v. Mississippi Power Co., 206 So.2d 321, 323 (Miss. 1968), the Court explained:
The money judgment of the special court of eminent domain is substituted for the rights taken in the land. Title to the proceeds of the judgment is in exactly the same status as the title to the land itself.
... .
The landlord and tenant, if satisfied with the total award, would therefore take title to the judgment in exactly the same proportion as their respective estates in the condemned property, subject to resolution by agreement or apportionment by the court.
Lennep, 347 So.2d at 346 (emphasis added).
The County Court in this case recognized that in accordance with the terms and conditions of the deed of trust,[13] Potters II and U.S. West had agreed regarding the proper apportionment of any condemnation award. There was no disagreement on this issue.
We think it apparent the County Court handled this matter correctly. The amount of the original principal balance of the Deed of Trust was not relevant to any issue before the Court, and it certainly had a tendency to mislead in that it no doubt included advances by U.S. West for items not taken. At most, it would have added nothing to managing partner Hall's testimony that Potters II originally put $844,000.00 into the purchase and improvement of the property and commencement of the business.
Potters, II nevertheless insists the deed of trust reflected "value" and was admissible as evidence tending to show value. Rule 401, Miss.R.Ev. The point is that no one with U.S. West or who was proffering the deed of trust offered any testimony reflecting any properly founded and admissible expert opinion regarding value. A like issue was addressed in Ellis v. Mississippi State Highway Commission, 487 So.2d 1339 (Miss. 1986). There, the property owner proffered testimony of the president of the bank which had made a loan to the property owner approximately a year before the taking and held a deed of trust on the property to secure payment of the loan. In that context, Ellis sought to establish the amount of the loan arguing that such was evidence of value. The Court in Ellis noted that under appropriate circumstances, an officer of a bank or lending institution who has appraised property or who has personal knowledge regarding the value of certain property to be taken as security for a loan may, in a condemnation proceeding, give his opinion regarding the fair market value of same. Times Square Realty, Inc. v. City of Grenada, 421 So.2d 1053, 1055-56 (Miss. 1982). Where, however, the bank officer had not studied the property but was merely a custodian of the loan file, we rejected his opinion. The present evidence is even less probative. Instead of submission of a lender's appraisal, these Appellants simply sought to introduce a deed of trust.
We find no error here.

VI.
Potters II tenders one further issue. It argues MSHC may not have made a valid *1240 pre-take offer. We have studied the issue with care and find it merits neither discussion nor reversal.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in results only.
NOTES
[1] We bow to the real estate appraisal profession and its conventional terminology, however wooden, and often hereafter refer to this original tract of land and its improvements as "subject property."
[2] Potters II has taken the lead throughout these proceedings. Hereinafter and where appropriate, the term "Potters II" should be taken to include Potters II and U.S. West.
[3] See generally, Jones, Just Compensation Via Fair Market Value Not Include The Kitchen Sink  It Could Be Noncompensable, 46 Miss.L.J. 1 (1975).
[4] At trial, the County Court gave the jury this instruction:

Jury Instruction No. P-2
The Court instructs the jury that it is the law in Mississippi that to determine the measure of damages in a condemnation proceeding you must consider fair market values. For this purpose, the definition of fair market value is the price that a willing buyer will pay and a willing seller will accept for this property as of the date of acquisition, December 28, 1989; both being informed of the highest and best use of the property; neither being under duress or under any compulsion to either buy or sell; and allowing a reasonable time for exposure on the open market, each having knowledge of the material facts concerning the property.
[5] Jury Instruction No. P-4, as approved by the County Court and submitted to the jury, read:

The Court instructs the jury that when a part of a larger tract of land is taken for public use, the property owner or owners should be awarded the difference between the fair market value of the whole tract immediately before the acquisition and the fair market value of that remaining immediately after the acquisition, without considering general benefits or injuries from the use to which the land taken is to be put that are shared by the general public.
[6] Questions about "highest and best use" always beg the further question, highest and best use of what? The law answers "the property" and not the particular business being pursued thereon.
[7] Here two principles are at odds with one another. An expert witness by definition will be familiar with the types of theory and data on which he ought rely in giving his opinion. See Rules 703, 705, Miss.R.Ev. When, as here, an expert witness opines that certain factors have to be considered in order to properly establish fair market value, we necessarily accord the expert substantial discretion. Attacks upon his foundational opinions often confuse admissibility with credibility. On the other hand, the expert has no authority to restate the law. Here the law provides what is being taken is a parcel of real estate to be valued at its highest and best use. But this does not afford an appraiser licensed to testify as to value components of something that is not being taken, i.e., the particular business Potters, II was pursuing, the Burger King franchise and its various accoutrements.
[8] Jury Instruction No. P-5 reads as follows:

In determining due compensation the State Highway Commission is required to pay as a result of its acquisition of the subject property, you are to base your decision not upon what the State Highway Commission has gained as a result of the acquisition, but upon what the Defendants have lost as a result of the acquisition, as measured by the difference between the fair market value of their property immediately before the acquisition and the fair market value of the property remaining immediately after the acquisition, but such due compensation may not include profits, if any, which may be derived from the business conducted on said property, and neither the value of the business conducted on said property nor any losses in connection therewith, if any, can be considered by you in determining such due compensation.
[9] See footnote 4, supra.
[10] Jury Instruction No. D-7 states:

The Court instructs the jury that in determining the fair market value of the property you may not consider profits, if any, which may be derived from the business conducted on the property except insofar as these profits, if any, have an effect on the fair market value of the property, and neither the value of the business conducted on said property nor any gains or losses in connection therewith, if any, can be considered by you in determining just compensation except insofar as the value of that business or the gains and losses derived therefrom have an effect on the fair market value of said property.
[11] Jury Instruction No. D-8 states:

The Court instructs the jury that in arriving at your verdict in this case you may not take into consideration damages, if any, to business being conducted on the property which might result from the acquisition of the State Highway Commission of Mississippi unless the business being conducted on the property has an effect on the fair market value of said property.
[12] Jury Instruction No. P-9 reads as follows:

The Court instructs the jury that you are not to award any compensation to any of the Defendants for any alleged damages to or loss of the value of trade fixtures.
Jury Instruction No. P-12 reads as follows:
The Court instructs the jury that you are not to award any compensation to any of the Defendants for any alleged damages to or the loss of value of personal property.
The Court further instructs you that personal property which is not in any manner physically attached to the real property involved in this suit may not be considered a part of the real property. Furthermore, in making your determination as to whether an article attached to the real property remains personal property or whether it has become a fixture and thus a part of the real property to which it is attached, you should take into consideration its nature, mode of attachment, purpose for which used and other attending circumstances indicating the intention to make it a temporary attachment or a permanent accession to the realty. And, inasmuch as it requires a positive act on the part of the person making the attachment to realty to change the nature and legal qualities of personal property into those of a fixture, the intention to make the article a permanent accession to the realty must affirmatively and plainly appear; and if it be a matter left in doubt or uncertainty, the legal qualities of the article are not changed, and the article must be deemed personal property.
[13] The deed of trust contains a condemnation clause assigning unto U.S. West all awards made in eminent domain proceedings for reduction of the indebtedness secured by the Deed of Trust or for restoration of the premises, at the option of U.S. West.