# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-02105-SCT

*DEDEAUX UTILITY COMPANY, INC. AND ANY AND ALL PARTIES HAVING OR CLAIMING ANY LEGAL OR EQUITABLE INTEREST IN THE PROPERTY DESCRIBED THEREIN*

*v.*

*THE CITY OF GULFPORT, MISSISSIPPI, A MUNICIPAL CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2008 |
| TRIAL JUDGE: | HON. T. LARRY WILSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY SPECIAL COURT OF EMINENT DOMAIN |
| ATTORNEYS FOR APPELLANTS: | PETER C. ABIDE |
| | HARRY R. ALLEN |
| | MICHAEL CLARK MCCABE, JR. |
| | JAMES H. HERRING |
| ATTORNEY FOR APPELLEE: | GARY WHITE |
| NATURE OF THE CASE: | CIVIL - EMINENT DOMAIN |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED - 04/07/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2010-CA-00290-SCT

*DEDEAUX UTILITY COMPANY, INC.*

*v.*

*THE CITY OF GULFPORT, MISSISSIPPI, A MUNICIPAL CORPORATION*

DATE OF JUDGMENT:               01/21/2010
TRIAL JUDGE:                    HON. JAMES H.C. THOMAS, JR.
COURT FROM WHICH APPEALED:      HARRISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:        MICHAEL CLARK MCCABE, JR.
                                PETER C. ABIDE
                                HARRY R. ALLEN
ATTORNEY FOR APPELLEE:          GARY WHITE
NATURE OF THE CASE:             OTHER
DISPOSITION:                    AFFIRMED - 04/07/2011
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLSON, P.J., RANDOLPH AND KITCHENS, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    In 1996, the City of Gulfport, Mississippi ("Gulfport") filed a complaint of eminent

domain against Dedeaux Utility Company ("Dedeaux"), a privately-owned, public utility

company, in the Special Court of Eminent Domain, Harrison County, Mississippi, First

Judicial District.  For the following eight years, Dedeaux continued to operate the utility.  A

physical taking did not occur until December 20, 2004, after a jury in the Special Court of

Eminent Domain, Harrison County, Mississippi, Second Judicial District, awarded Dedeaux

$3,634,757 for the taking.  Dedeaux appealed and Gulfport cross-appealed.  *See **Dedeaux***

***Utility Co., Inc. v. City of Gulfport***, 938 So. 2d 838, 840 (Miss. 2006) ("***Dedeaux I***").  In

September 2006, this Court reversed and remanded for a new trial.  *See id*. at 846.  On retrial,

the jury awarded Dedeaux $5,131,676 for the taking.  Following the trial court's denial of

post-trial motions by both parties, Dedeaux filed notice of appeal and Gulfport filed notice

of cross-appeal.

2

¶2.     Regarding Cause No. 2008-CA-02105-SCT, Dedeaux possessed a Certificate of Public Convenience and Necessity ("Certificate") from the Mississippi Public Service Commission ("PSC") to provide certain water and sewer services within a 2.6-square-mile area of Harrison County.  On January 2, 1994, the territory served by Dedeaux was annexed by Gulfport.  On December 3, 1996, Gulfport filed a complaint of eminent domain against Dedeaux in the Special Court of Eminent Domain, First Judicial District of Harrison County. It is undisputed that the Dedeaux utility system was of high quality, well-maintained, and well-functioning at this time.  For the following eight years, Dedeaux continued to operate the utility.  Prior to trial, the court granted Dedeaux's "Motion for Change of Venue," transferring the case from the First Judicial District to the Special Court of Eminent Domain, Second Judicial District of Harrison County ("trial court").  On December 13, 2004, final judgment was entered on the jury's award of $3,634,757 to Dedeaux.  On December 20, 2004, Gulfport took possession of the physical assets and assumed operation of the utility. Thereafter, Dedeaux appealed and Gulfport filed a cross-appeal.  *See id*. at 840.

¶3.     On September 28, 2006, this Court reversed the trial court and remanded for a new trial.  *See id*. at 846.  This Court held that the trial court had erred in denying Dedeaux's motion to strike the testimony of Gulfport's expert, James Stokes.  We found that the data relied upon "excludes consideration of the value of contribution property[,]"[1] which "must

---

[1]In valuing the property of a public utility for "rate-making purposes," the PSC does "not include property donated to such utility without any consideration nor shall operating expenses include depreciation of such donated property."  Miss. Code Ann. § 77-3-43(2) (Rev. 2009).  According to Dedeaux's expert, James Elliott, such "donated property" (also

be included in the plant value[,]" and Stokes's testimony "was not based on sufficient facts and data and was therefore unreliable." *Dedeaux I*, 938 So. 2d at 841-42 (quoting Julius L. Sackman, *Nichols on Eminent Domain* § 15.07, at 15-48 (3d ed. 2000)). Additionally, this Court held that the trial court had erred in failing to follow the directive of Mississippi Code Section 11-27-19 "when it compounded the interest [on the eminent domain judgment] and when it made a distinction between pre-judgment interest and post-judgment interest." *Dedeaux I*, 938 So. 2d at 846 (citing Miss. Code Ann. § 11-27-19 (Rev. 2004)).

¶4.     On September 22, 2008, the jury trial in the present case commenced. The jury awarded $5,131,676 to Dedeaux. Thereafter, Dedeaux filed a "Motion for New Trial and for Judgment Notwithstanding the Verdict" and Gulfport filed a "Motion for New Trial," both of which were denied by the trial court. Dedeaux then filed notice of appeal and Gulfport filed notice of cross-appeal.

¶5.     Following the trial court's denial of its "Motion to Dismiss, or, Alternatively, for Declaratory Judgment on the Issue of Contributions in Aid of Construction After December 3, 1996, and Other Matters Constituting Inverse Condemnation," Dedeaux filed a separate action in the Chancery Court of Harrison County, Mississippi, First Judicial District, "out of an abundance of caution." In so doing, Dedeaux sought to cover its bases and "protect this [claim] procedurally" should this Court "determine that assertion of 'inverse condemnation' in the eminent domain proceeding is premature since the actual inverse

referred to as contributions-in-aid-of-construction ("CIAC")) is generally "money or other property . . . contributed by a developer to a utility company for the expansion, extension, improvement, or replacement of the utility's water or sewage facilities." Elliott added that in fast-growing service areas, CIAC provides a "very significant sourc[e] of value added."

4

condemnation did not occur until final judgment" in September 2008, and "therefore would be a separate cause of action." In January 2010, the chancery court entered an "Order" granting Gulfport's "Motion to Dismiss" that action, concluding that, under "the Doctrine of Priority of Jurisdiction," it lacked subject-matter jurisdiction because the issues raised therein were "presently on appeal before the Mississippi Supreme Court."

¶6. Following Dedeaux's appeal of that ruling, this Court consolidated the appeal in that case, Cause No. 2010-CA-00290-SCT, with the appeal in Cause No. 2008-CA-02105-SCT.[2]

**ISSUES**

¶7. This Court will consider:[3]

I. Whether the trial court erred in admitting contested expert testimony on the valuation of a privately owned, public utility.
II. Whether the trial court erred in denying Dedeaux's request for declaratory judgment on its inverse-condemnation claim.
III. Whether the trial court erred in excluding evidence of Gulfport using a depreciated cost methodology which included the cost of overcoming existing constraints.
IV. Whether the trial court erred in prohibiting Dedeaux from cross-examining Stokes regarding his testimony at the first trial, deemed "unreliable" in *Dedeaux I*, and other prior related opinions.
V. Whether the trial court erred in overruling Gulfport's objection to Elliott's testimony regarding "alternatives and substitutes."
VI. Whether the trial court erred in admitting evidence, and then erred in peremptorily instructing the jury, that the "highest and best use" of the Dedeaux utility system is as an unregulated utility.
VII. Whether the trial court erred in granting jury instructions which emphasized specific elements of damages.

---

[2]This Court will address the issues raised in Cause No. 2010-CA-00290-SCT in Issue II. *infra*.

[3]In the interest of clarity, this Court has rearranged, reordered, and, in some cases, merged the issues as presented on direct appeal by Dedeaux and on cross-appeal by Gulfport in Cause No. 2008-CA-02105-SCT.

VIII. Whether the trial court erred in overruling Dedeaux's objection to Gulfport's closing argument.

IX. Whether the trial court erred in denying Dedeaux's request for declaratory judgment on its equal-protection claim.

X. Whether the trial court erred in denying Gulfport's "Motion to Recover Excess Interest."

XI. Whether the trial court erred in denying Gulfport's "Motion to Reconsider Change of Venue."

## ANALYSIS

**I. Whether the trial court erred in admitting contested expert testimony on the valuation of a privately owned, public utility.**

¶8.　This Court has stated that:

> "[w]hen reviewing a trial court's decision to allow or disallow evidence, including expert testimony, we apply an abuse of discretion standard." ***Canadian Nat'l/Ill. Cent. R.R. v. Hall***, 953 So. 2d 1084, 1094 (Miss. 2007). Unless this Court concludes that a trial court's decision to admit or exclude evidence was arbitrary and clearly erroneous, that decision will stand. ***Irby v. Travis***, 935 So. 2d 884, 912 (Miss. 2006). Under Mississippi Rule of Evidence 702, trial courts are charged with being gatekeepers in evaluating the admissibility of expert testimony. ***Id***. "We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony." ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 40 (Miss. 2003).

***Watts v. Radiator Specialty Co.***, 990 So. 2d 143, 145-46 (Miss. 2008).

¶9.　Mississippi Rule of Evidence 702 provides that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. "This rule makes it necessary for a trial court to apply a two-pronged inquiry when evaluating the admissibility of expert testimony: (1) is the witness qualified,

6

and (2) is the testimony relevant and reliable?" *Watts*, 990 So. 2d at 146 (citing *McLemore*, 863 So. 2d at 35).

### *(A) Expert Qualification*

¶10.    Dedeaux challenges whether Gulfport's experts, Dax Alexander and James Stokes, were qualified "by knowledge, skill, experience, training, or education . . . ."[4] Miss. R. Evid. 702.  The testimony of Alexander and Stokes was interrelated because Alexander provided per-unit replacement-cost estimates and useful-life estimates for the components of the Dedeaux utility system as of December 3, 1996, which were then used by Stokes in his comprehensive valuation.

### **Dax Alexander**

¶11.    Alexander is a Mississippi-licensed engineer and the president of an engineering firm. According to Alexander, his experience included involvement in approximately twenty major sewer projects in south Mississippi.  Alexander conceded that, prior to 2007, he had never provided a replacement-cost estimate for a utility system "in a court-related setting . . . ." After hearing Dedeaux's motion in limine to exclude Alexander's testimony, that motion was denied.  At trial, Alexander was tendered and accepted as an expert in "water and sewer system design and construction."

---

[4]This Court notes that the qualifications of Dedeaux's expert, James Elliott, are not challenged on appeal.  Elliott is a "consulting civil engineer" who had done valuation studies on approximately thirty public utility systems in Mississippi.  In several of those cases, including *Bear Creek Water Association v. Town of Madison*, 416 So. 2d 399 (Miss. 1982), Elliott was admitted as an expert witness at trial.

¶12.    On appeal, Dedeaux generally asserts that the trial court abused its discretion in qualifying Alexander as an expert because he "had never prepared a replacement cost estimate for the purpose of determining the fair market value of a public utility." But given Alexander's engineering background and his experience in the construction of water and sewer systems, this Court cannot conclude that the trial court acted in an arbitrary or clearly erroneous manner (i.e., abused its discretion) in deeming Alexander qualified to testify as an expert in the field of "water and sewer system design and construction." *See Watts*, 990 So. 2d at 145-46.

### James Stokes

¶13.    Stokes is a certified public accountant, certified valuation analyst, and the managing partner of an accounting and business consulting firm. According to Stokes, he had conducted approximately forty business valuations by the time of trial and previously had been qualified as an expert in the general field of business valuation, although not "in the specific industry of water and sewer . . . ." Furthermore, Stokes had been involved in the valuation of another utility company, although that case had yet to go to trial. Stokes was tendered and accepted as an expert in "business valuation."

¶14.    According to Dedeaux, it:

> is not relying only upon the fact that other [experts] are more qualified than [Stokes]; or only upon the fact that [Stokes] has never before been qualified as an expert witness in public utility valuation; or only upon the fact that [Stokes] has only attempted to value one other utility company. *Dedeaux's argument is based upon the totality of all these circumstances, along with the fact that [Stokes] used an unlawful valuation methodology in the first trial . . . and that he created a flawed – and hereto before unheard of – methodology for the valuation of the intangible assets of a public utility company.*

8

(Emphasis added.) But in so arguing, this Court finds that Dedeaux is merely attempting a backdoor challenge to Stokes's methodology in the guise of a qualification attack. The reliability of Stokes's opinions will be addressed *infra*, but this Court cannot conclude that the trial court abused its discretion in deeming Stokes, a certified valuation analyst with extensive valuation experience, qualified to testify as an expert in "business valuation." *See id*.

### *(B) Reliability of Expert Testimony*[5]

¶15. "Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to '[specialized] knowledge' establishes a standard of evidentiary reliability." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993). Such testimony must be "(1) . . . based upon sufficient facts or data, (2) . . . the product of reliable principles and methods, and (3) . . . the principles and methods" must be applied by the witness "reliably to the facts of the case." Miss. R. Evid. 702. Such "foundational facts" must "afford a 'reasonably accurate basis' for the expert's conclusions." *Fielder v. Magnolia Beverage Co.*, 757 So. 2d 925, 929 (Miss. 1999) (quoting *Gulf Ins. Co. v. Provine*, 321 So. 2d 311, 314 (Miss. 1975)).

¶16. Under Rule 702, the trial judge has "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *McLemore*, 863 So. 2d at 39 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158,

---

[5]Neither party raises the issue of relevance.

119 S. Ct. 1167, 1179, 143 L. Ed. 2d 238 (1999)). But such "discretionary authority" does not extend to expert testimony based only upon "subjective beliefs or unsupported speculation." *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 590). *See also Gulf South Pipeline Co. v. Pitre*, 35 So. 3d 494, 499 (Miss. 2010) ("merely speculative expert opinions should not be admitted"); *Watts*, 990 So. 2d at 149 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997)) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert"); *Edmonds v. State*, 955 So. 2d 787, 792 (Miss. 2007) ("a court should not give . . . an expert carte blanche to proffer any opinion he chooses").

¶17. "[A]n eminent domain suit is a peculiar type of action where the condemnor is under a heavy and non-delegable duty and responsibility to pay the defendant landowner the full fair market value of her property." *Sarphie v. Miss. State Highway Comm'n*, 275 So. 2d 381, 383 (Miss. 1973). *See also* U.S. Const. amend. V ("[n]o person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation"); Miss. Const. art. III, § 17 (1890) ("[p]rivate property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law . . . ."). This Court has stated that:

[t]he canonical definition [of fair market value] is[:]

the most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after

10

> reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 43 (10th ed. 1992) . . . . One formulation familiar in this state is, the sales price that would be negotiated between knowledgeable and self-interested persons, one who wants to purchase and one who wants to sell, the seller being under no obligation or compulsion to sell, and the buyer being under no necessity of having the property.[6]

*Potters II v. Miss. State Highway Comm'n*, 608 So. 2d 1227, 1231 (Miss. 1992).

¶18.  Fair market value is generally "established as of the date of the filing of the complaint."[7] Miss. Code Ann. § 11-27-19 (Rev. 2004). *See also Pearl River Valley Water Supply Dist. v. Brown*, 182 So. 2d 384, 385-86 (Miss. 1966) ("the time of taking for the purpose of determining due compensation is the date of the institution of the eminent domain suit."). The primary inquiry is "what is the worth of that being taken to the person having to sell his property." *Times Square Realty, Inc. v. City of Grenada*, 421 So. 2d 1053, 1055 (Miss. 1982). *See also United States v. Miller*, 317 U.S. 369, 375, 63 S. Ct. 276, 281, 87 L. Ed. 336 (1943) ("[s]ince the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. . . . [I]ts special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be

---

[6]This Court notes that application of the aforementioned fair-market-value definition is more complicated in the context of this case as "public utility properties are seldom bought and sold on the open market." *City of Phoenix v. Consol. Water Co.*, 415 P.2d 866, 869 (Ariz. 1966).

[7]The constitutionality of this statutory provision as applied to privately-owned, public-utility companies is discussed in Issue II. *infra*.

excluded as an element of market value."). In making that determination, the condemnee is entitled to:

> the difference between the fair market value of the business as a going concern immediately before the damage and the fair market value of any assets remaining after the business closed and ceased to operate as a public utility. In determining the before value of the utility business so damaged, every element of the plan or system which was reasonably required for the operation thereof and which entered into and remained a part thereof should be taken into account. This means that the appraiser should consider the certificate of public convenience and necessity as an element of value, for without it the entire physical plant would be worthless. . . . *The value of the utility as a going concern is obtained by taking a comprehensive view of each and all of the elements of property, tangible and intangible, and considering them as inseparable parts of the business entity*.

*Bear Creek*, 416 So. 2d at 401-02 (quoting *City of Jackson v. Creston Hills, Inc.*, 252 Miss. 564, 578, 172 So. 2d 215, 221-22 (1965)) (internal citations omitted) (emphasis added). *See also* Sackman, *Nichols on Eminent Domain* § 15.07, at 15-48 to 15-49 ("[w]hen the plant of a public service corporation is taken by eminent domain, the corporation is not limited to the value of its physical property, or to the cost of reproducing the same, but it is entitled to be paid for the value of its property and franchises taken together as a going concern and as parts of one working system. . . . The elements ordinarily considered in ascertaining the value of the utility are the current value of the tangible property of the company, the earnings, both present and future, of the company, the 'going value' of the plant, and the amount of money required to put the plant in good condition."). In *Bear Creek*, this Court explained that "[w]e think it impractical to assume that a businessman interested in buying a going business would blind himself to past revenues, present physical facilities, the likelihood of expansion and other business factors, including the likelihood of future

12

revenues, because all are essential to its present market value." **Bear Creek**, 416 So. 2d at 403. The valuation process is to be guided by the three, interrelated "approaches to value: the cost approach, the income capitalization approach, and the market-data or comparative sales approach." **Rebelwood, Ltd. v. Hinds County**, 544 So. 2d 1356, 1360 (Miss. 1989). *See also* **Potters II**, 608 So. 2d at 1231.

¶19. At trial, Stokes valued the Dedeaux utility system at $3,691,328, which consisted of:

> Fair market value of depreciated operating assets - $3,451,961
> Land value - $20,165
> Other intangibles including the Certificate and going concern value - $255,202

Elliott valued the Dedeaux utility system at $9,846,288, which consisted of:

> Depreciated replacement cost of water/sewer facilities - $7,506,000
> Land value - $20,200[8]
> Certificate value - Projected CIAC - $1,494,700
> Certificate value - Projected cash flow - $800,388
> Transitional assistance - $25,000[9]

### *(1) Tangible assets*

### Dax Alexander and James Stokes

¶20. In rendering a replacement-cost estimate for the Dedeaux utility system's components as of December 3, 1996, Alexander determined a unit price for each of the items provided by Stokes based upon "bid tabulations for actual projects in the area[,]" then multiplied that unit price by the quantity data provided by Stokes. In calculating this estimate, Stokes instructed Alexander to determine "the cost to construct the Dedeaux system new in 1996 .

---

[8]The land value was determined using the comparative-sales approach.

[9]According to Elliott, "transitional assistance" includes "things like turning over to the new owner your maps of the system, your record of the system, your billing records, who your customers are, where they're located . . . ."

13

. . under the conditions it was originally constructed[,]" i.e., assuming "there was *no development in the area*." (Emphasis added.) As such, Alexander's estimate admittedly was not based upon the cost to a contractor who "would have to go in[to] an existing subdivision and rebuild the water and sewer systems." On this point, Alexander acknowledged that replacing the system in 1996 would have required addressing existing constraints, and that such an estimate would "possibly" be greater. Likewise, Stokes testified that "[i]f you had to replace what was already there you would have to dig up streets and driveways and everything else to replace and *it would cost a lot more*." (Emphasis added.) But Stokes added that this was a "good system,"[10] and "[t]here's no reason to add cost to these items in theory that you've got to go dig them up and fix the roads and the streets when they don't have to be dug up." According to Stokes, "[e]verything I've ever read about depreciated replacement cost . . . states . . . you replace the asset with current cost and then you depreciate it back to the date and time it was placed in service." Utilizing Alexander's per-unit replacement cost and useful-life estimates for the components of the Dedeaux utility system as of December 3, 1996, Stokes performed the "depreciation calculation" and determined the depreciated replacement cost of Dedeaux's operating assets was $3,451,961.

---

[10]This fact is undisputed.

14

**James Elliott**[11]

¶21.    Elliott testified that, using his "standard methodology" for replacement-cost valuation, the depreciated replacement cost for the Dedeaux utility system was $7,506,000. According to Elliott, this "standard methodology" involved an appraisal "based on replacing [the utility system] in developed land cost at the time of" the eminent-domain action. Elliott testified that depreciated replacement cost does not involve "an actual digging up [of] the facilities," but that "you would value them on the basis that I had to replace them today with the constraints on the land that we have at the present time at the date of taking." According to Elliott, the difference between his depreciated replacement-cost calculations and those of Gulfport's experts was largely based upon the fact that "I'm looking at developed land. Generally the cost of working in developed land as opposed to undeveloped land is *two to three times as much*." (Emphasis added.) At the pretrial hearing on Dedeaux's motion in limine to exclude Alexander's testimony, Elliott acknowledged that there is some debate on the proper methodology for valuing the tangible assets of a utility system. But at trial, Elliott added that "I don't know anybody that's paid raw land cost."

**Trial court ruling**

¶22.    The trial court viewed "the valuation of raw land versus the cost to overcome constraints" as "the biggest issue in this case . . . ." But according to the trial judge, he could find no authority stating that "it can't be new and then depreciated back to when it was put in or that it had to be put in as [Elliott] . . . is going to testify because . . . different methods

---

[11]This Court notes that Elliott's valuation methodology as to the tangible assets of the Dedeaux utility system is *not* challenged on appeal.

of appraisal could be used and one method will not be reliable over all others." As applicable caselaw and treatises only "set out what factors to consider[,]" without providing "the exact method by which you do it," the trial court found that the "raw land" versus "existing constraints" issue was a "jury question." According to the trial court:

> [t]he one thing this [c]ourt has been able to conclude from the hours of testimony from both sides in questioning each other's experts is that there is no magic formula into which one just plugs the numbers and out the other side comes "the answer." Even the experts from both sides disagree on what data is to be used . . . .

Based thereon, the trial judge admitted the "facts and figures" of Alexander and Stokes, with such testimony remaining "a matter of credibility for the jury's determination." Jury Instruction D-6a provided that the depreciated replacement cost:

> *may include* the cost which may be incurred to overcome the constraints which existed upon the property at that date, . . . in the event you find from a preponderance of the evidence that a "willing purchaser" and "willing seller" would consider those costs to be a part of the "fair market value" . . . .

(Emphasis added.)

### Analysis

¶23.    Dedeaux contends that the methodology used by Alexander and Stokes for determining the depreciated replacement cost of Dedeaux's tangible assets was "unreliable," as it was based upon the "raw land assumption." Therefore, Dedeaux argues that the trial court "abused its discretion in admitting [their] testimony." Gulfport responds that the "cost method" used by Stokes "complies with accepted valuation methodology[,]" as "[t]he correct valuation standard is to determine the 'cost new' (not the cost to rebuild) of the property . . . ." Gulfport adds that "Dedeaux cannot cite one modern day authoritative source in support

16

of its assertion that the correct valuation methodology is to compute the cost to rebuild the Dedeaux system in place." According to Gulfport:

> Stokes used the correct valuation methodology by determining (through [Alexander]) the cost new of the Dedeaux physical facilities. He then applied the appropriate depreciation to obtain the depreciated cost new of the facilities. The [t]rial [c]ourt did not abuse its discretion in allowing [Stokes's] testimony regarding the value of the physical facilities.

¶24. This Court has stated that:

> [t]he cost approach is a method by which the value of the property is derived by estimating the replacement cost of the improvements and deducting from that figure the estimated physical depreciation and any form of obsolescence, if appropriate. This figure is then added to the market value of the land to yield an overall valuation of the realty.

**Rebelwood**, 544 So. 2d at 1360. *See also* American Society of Appraisers, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*, 43 (2d ed. 2000) ("[i]n its simplest form, the cost approach is the current cost (as if new) less all forms of depreciation."). The "cost approach" involves "five basic steps":

  1. The estimate of the land value as if vacant[;]

  2. *The estimate of the current cost of reproducing or replacing the existing improvements[;[12]]*

---

[12]This Court has referred to reproduction cost and replacement cost interchangeably. *See* **Rebelwood**, 544 So. 2d at 1360; **Miss. State Highway Comm'n v. Owen**, 308 So. 2d 228, 231 (Miss. 1975). But some authorities distinguish the terms. *See* Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 244 (4th ed. 2002) (providing separate definitions of "replacement cost" and "reproduction cost"); American Society of Appraisers, *Valuing Machinery and Equipment*, at 44 ("[r]eplacement cost is the current cost of a similar new property having the nearest equivalent utility as the property being appraised, whereas reproduction cost is the current cost of reproducing a new replica of the property being appraised using the same, or closely similar, materials."). In any case, there is authority to suggest that either cost base may be used, as "[t]he market and physical condition of the appraised property usually suggest[s] whether an exact replica of the subject property

17

3. The estimate of accrued depreciation from all causes[;]

4. Deduction of accrued depreciation estimate to arrive at indicated value of improvements[;]

5. The addition of the land value to the indicated value of the improvements to develop indicated property value.

*Rebelwood*, 544 So. 2d at 1360 (citations omitted) (emphasis added). There is no dispute that the cost approach was utilized by both Stokes and Elliott. The debate pertains to the "foundational facts" applied by those experts (i.e., the assumption of raw land or existing constraints) in their cost approach calculations. *Fielder*, 757 So. 2d at 929.

¶25. In *City of Phoenix*, the Arizona Supreme Court determined that the lower court erred in excluding the cost of overcoming existing constraints. *See City of Phoenix*, 415 P.2d at 870. According to that Court:

> [t]he Constitution requires just compensation . . . . Necessarily, any proposed purchaser . . . would take into consideration the fact that the cost of cutting and relaying pavement would not have to be incurred since it was already completed. Obviously, this would affect the market price of this utility in the eyes of a willing purchaser.

*Id*. *See also Matter of Onondaga County Water Dist. v. Bd. of Assessors of Town of Volney*, 324 N.Y.S.2d 857, 862 (N.Y. Sup. Ct. 1971) ("where the approach to market value lies in assembling construction costs[;]" costs like "site preparation, excavation, backfilling, pavement cutting and replacement . . . must be included."); Sackman, *Nichols on Eminent Domain* § 15.07[3], at 15-53 to 15-54 (reproduction cost "has been held to be evidence of the

---

(reproduction cost) or a substitute property with similar utility (replacement cost) would be a more suitable comparison." Appraisal Institute, *The Appraisal of Real Estate*, 349-50 (12th ed. 2001).

value of such plant[,]" and includes "not only the actual cost of erecting the physical structure of the plant but also such essential elements in connection with the construction as overhead expenses, executive and management costs, and legal and engineering fees"). *But see id*. at § 15.09[3], at 15-64 ("why talk about the reproduction costs of that which it would be utterly idle to reproduce?"). However, the court in *City of Phoenix* recognized that "the weight of authority seems to be against" its position. *City of Phoenix*, 415 P.2d at 870 (citation omitted).

¶26.   As this Court finds no authority which explicitly mandates using either approach, and the parties do not dispute that the Dedeaux utility system was of high quality on the date of taking, this Court concludes that the trial court did not abuse its discretion in admitting all such expert testimony and leaving resolution of the evidence presented to the jury. *See Watts*, 990 So. 2d at 145-46; *McLemore*, 863 So. 2d at 39. "When considering the liberal thrust of the rules of evidence and the qualifications of the witnesses," this Court "cannot find that the trial judge abused his gatekeeping discretion by allowing the jury to hear [such] expert testimony . . . ." *Poole v. Avara*, 908 So. 2d 716, 724 (Miss. 2005). On remand, *see* Issue I.(B)(2)(ii) & (iii) and Issue II. *infra*, this Court would emphasize that a "reasonably accurate basis" could better be achieved by development of "foundational facts" concerning the physical condition of the property (e.g., identifying developed versus undeveloped land) at the relevant date for determining fair market value. *Fielder*, 757 So. 2d at 929.

19

### *(2) Intangible assets*

¶27.    As previously noted, Stokes valued Dedeaux's intangible assets at $255,202, while Elliott's valuation was $2,320,088 (consisting of $1,494,700 in projected CIAC; $800,388 in projected cash flow; and $25,000 in transitional assistance).

¶28.    The parties do not dispute that the present value of future cash flow is a requisite intangible-asset consideration.  As the trial judge stated, "[t]here is no doubt the case law provides that future revenue is an element of damages in these type lawsuits for eminent domain proceedings."  *See **Bear Creek***, 416 So. 2d at 403 (referring to the "likelihood of future revenues"); Sackman, *Nichols on Eminent Domain* § 15.07, at 15-48 to 15-49 (referencing future earnings).  But the parties do dispute the proper methodology to be used in determining the present value of future cash flow.  The parties also disagree as to whether the present value of future CIAC is a proper intangible-asset consideration.

### **James Stokes**

¶29.    Stokes valued the Certificate at $255,202, which was a present-value figure based upon "the rates that [Dedeaux] had set for them by the [PSC]" and "the rates that [Gulfport] charged, being an unregulated utility. . . .  [S]ince the [Dedeaux] rates were higher I would say that the value of the Certificate is [the] ability for Dedeaux to charge a higher rate than an unregulated utility in the same area."  Stokes did not consider the present value of future CIAC.  Stokes further acknowledged that he knew of no methodology supporting his valuation of the Certificate, only that "*it's my opinion*."  (Emphasis added.)

## James Elliott

¶30. For both projected cash flow and projected CIAC, Elliott used the income-capitalization approach and estimated the present value for a period of fifteen years into the future. According to Elliott, "15 years in my opinion would be a reasonable time period that would not be speculative[,]" as "generally . . . 10 years is the minimum and 20 years is the max[,]" taking into account the discount rate.

¶31. Elliott opined that the present value of future cash flow was $800,388, based on "net revenue and cash flow trends of [Dedeaux] over a ten-year period extending from 1987 through 1996." But according to Elliott, those net-revenue and cash-flow figures were limited by having only "$357,000 of physical assets in the rate base . . . ."[13] In deposition testimony, Elliott acknowledged that the physical facilities and the Certificate work in conjunction to produce present and future income, and that he could not distinguish which percentage of future growth should be allocated to each. Nonetheless, Elliott attributed all of the present value of future cash flow to the Certificate, attributing no return to the fixed, physical assets.

¶32. Elliott's intangible-asset valuation also included "the probability of future [CIAC] the utility company could reasonably expect to receive . . . from developers building new subdivisions in the Dedeaux service areas." According to Elliott, this figure was based upon taking "the average rate of contributions [from 1970 through 1996] and . . . project[ing] that

---

[13]Elliott testified that PSC rates "are based strictly on your original cost basis less depreciation. And in this cost basis you don't get any contributed capital and you don't get any facilities that are depreciated out that are still in use and useful. So that cuts way down on what you can get a return on."

forward into the future 15 years." The inclusion of future CIAC was based upon Elliott's "professional judgment" and the "basic methodology" he has used in prior public-utility valuations, although he could *not* identify any authority for this practice. According to Elliott, if the "likelihood of expansion" is a consideration under **Bear Creek**, then "interrelating values [are] too because if you have growth then you have future [CIAC] also that go with the growth." *See Bear Creek*, 416 So. 2d at 403. He added that "no prudent businessman would not consider [future CIAC] because that is one of the primary values that you get by right of holding a certificate to provide exclusive service."

### (i) Elliott's fifteen-year estimates

¶33. The trial court determined that Elliott's fifteen-year estimates were admissible, as Stokes "did kind of the same thing[,]"[14] and Elliott was "certainly subject to cross-examination . . . ."

¶34. Gulfport argues that Dedeaux has failed to produce any "authoritative source" in support of "Elliott's present value of fifteen years cash flow method." Regarding that fifteen-year estimate, Gulfport maintains that Elliott has speculatively "spli[t] the difference between his ten and twenty year calculations." Dedeaux responds that Elliott "explained in detail why he chose 15 years" for his projections, such that this opinion was appropriately subjected to challenge on cross-examination, but not excluded.

---

[14]At the hearing on Gulfport's motion in limine to exclude Elliott's testimony, Stokes testified that he projected the present value of future income through 2026 and even into infinity.

¶35.    Neither party has provided an authoritative statement on the time period to be used in estimating the present value of future income.  In light of "the liberal thrust of the rules of evidence" and Elliott's qualifications, this Court "cannot find that the trial judge abused his gatekeeping discretion by allowing" Elliott to testify using fifteen-year estimates. *Poole*, 908 So. 2d at 724.  Instead, "[v]igorous cross examination" and "presentatio[n] of contrary evidence" was sufficient to challenge such testimony. *McLemore*, 863 So. 2d at 36 (quoting *Daubert*, 509 U.S. at 595-96).

### (ii) Present value of future cash flow

¶36.    The trial judge stated that his "biggest problem" with Stokes's valuation of the Certificate was that the methodology was "just his opinion."  But the trial judge further noted that among *Bear Creek*, *Dedeaux I*, and relevant treatises "it is still not very clear . . . what exactly goes in the evaluation of intangibles."[15]  Specifically, the trial judge stated that "[a] majority of the factors set forth . . . to be considered are at best based on speculation such as future factors, [like] residential growth, future revenues and . . . this [c]ourt is not aware of any approved method that must be used to calculate th[ose] factor[s]," then "reduce them to some finite number."  Viewing the factors as collectively analogous to "personal injury cases where pain and suffering is considered," the trial judge determined that Stokes's intangible-asset valuation was a matter "of credibility for the jury."  As to Elliott's testimony, the trial court order denying Gulfport's motion in limine to exclude Elliott's testimony provided that

---

[15]Elsewhere, the trial judge stated that *Bear Creek* is unclear because it lists the factors to consider, but "[w]hat they don't tell me . . . is how you reach those figures – what method do you use in getting there."  In other words, "do they mean that there's got to be [a] set figure to that or is that just something the jury can consider."

"[t]he [c]ourt is of the opinion that the methodology used by [Elliott] as to future revenues . . . [is] in accordance with accepted methods of evaluation of a utility business . . . ."

### (a) James Stokes

¶37.    Dedeaux argues that Stokes's intangible-asset valuation methodology was unreliable, "*ipse dixit* speculation" which suggested that "the value of the Certificate is simply the difference between the revenue derived from the higher rates it is permitted to charge as a monopoly and the lower rates of other unregulated public utilities." According to Dedeaux, the Certificate value "is not merely the right to operate a monopoly and charge a higher rate, . . . it is the 'essential right to serve[,]'" the value of which "can only be determined by measuring the loss of future economic benefits . . . at the time the Certificate is terminated by condemnation." Accordingly, Dedeaux maintains that the trial court "abused its discretion by admitting into evidence [Stokes's] testimony on this subject."

¶38.    Gulfport responds that Stokes "properly allocated a portion of the estimated future income of Dedeaux to the intangible assets and properly capitalized the estimated future income to arrive at an estimate of the value of the intangible assets." While acknowledging that this method is not provided for in *Nichols on Eminent Domain*, Gulfport asserts that treatise "does not state that calculating the excess income over a fair return on tangible property is the *only* method which may be used to allocate or attribute 'excess' income to the franchise[,]" and that Stokes's method is "logical and reliable . . . ."

¶39.    As the Certificate is required by statute in order to provide water and sewer services, it is undoubtedly "an element of value . . . ." **Bear Creek**, 416 So. 2d at 401-02. *See also* Miss. Code Ann. § 77-3-11(1) & (3) (Rev. 2009); Sackman, *Nichols on Eminent Domain* §

24

15.08, at 15-57. Under the income-capitalization approach, "the anticipated net income which the property is expected to generate over its usable life is capitalized and processed to indicate the capital investment which produces the net income." **Rebelwood**, 544 So. 2d at 1361-62. *See also* **Potters II**, 608 So. 2d at 1232 ("future profitability is a major factor our knowing and willing buyer and seller will sensibly consider before settling upon a sales price"); Sackman, *Nichols on Eminent Domain* § 15.08, at 15-57 to 15-58 ("[t]he value of the franchise may be reached by capitalizing income that would probably be earned during its existence over and above a fair return upon the tangible property in the plant"). Without question, Stokes failed to implement the aforementioned income-capitalization approach and instead focused only on the rate differential between Dedeaux and Gulfport at the date of taking. But applying Gulfport's rates is error. The only rate to be considered is that which a hypothetical buyer would be able to charge as a regulated utility. Moreover, Stokes's valuation was merely his "opinion," with no supporting recognized methodology. *Ipse dixit* opinions are inadmissible. *See* **Pitre**, 35 So. 3d at 499; **Watts**, 990 So. 2d at 149; **Edmonds**, 955 So. 2d at 792. Expert testimony based upon such "subjective beliefs or unsupported speculation" should be excluded, therefore, this Court concludes that the trial court abused its discretion in admitting Stokes's testimony on the present value of future cash flow. **McLemore**, 863 So. 2d at 36.

### (b) James Elliott

¶40. Gulfport argues that Elliott's calculation of the present value of future cash flow was "not the product of reliable principles and methods." According to Gulfport, because Elliott's:

estimate of future income and cash flow is based on his estimate of future growth, it follows that he cannot allocate the future cash flow between that pertaining to the Certificate and that pertaining to the physical facilities. Simply put, Dedeaux could not sell water and sewer services without the authority of the Certificate and without the physical facilities to deliver the services.

Yet Gulfport notes that Elliott "us[ed] all of the projected income and resulting cash flow to value the Certificate, . . . ignoring the admitted contribution of the physical facilities to this cash flow stream."

¶41. This Court finds no fault with the income-capitalization method used by Elliott in determining the present value of future cash flow. While Elliott admitted that the physical facilities and Certificate collectively produce future income, he chose to attribute the entire present value of future cash flow to the Certificate. The ability to produce income is interdependent upon both, for under the circumstances presented, neither can produce income without the other being in place. Whether the cash flow was attributed by Elliott to one, the other, or collectively both, is of no consequence as long as they are not cumulative. Accordingly, this Court concludes that the trial court did not abuse its discretion in admitting Elliott's testimony on the present value of future cash flow. *See McLemore*, 863 So. 2d at 36.

### (iii) Present value of future CIAC

¶42. Regarding future CIAC, although the trial judge stated "it's the one that's probably worried me the most[,]" Elliott's testimony was admitted because *Bear Creek* permitted the consideration of CIAC which "had been developed and w[as] in but had not been given to Bear Creek" at the time of the taking. In so ruling, the trial judge equivocated, stating that

"I have real questions about that because of . . . the way it reads in" **Bear Creek**. *See Bear*

*Creek*, 416 So. 2d at 399.

¶43. Gulfport argues that Dedeaux has failed to produce any "authoritative source" in

support of the use of "the present value of future [CIAC]" in valuing the Certificate.

Gulfport further:

> submits that if Dedeaux can use the "present value" of the increase in value of
> its water and sewer lines by way of donated property occurring after the date
> of taking, then Dedeaux could also get an appraiser to estimate how much its
> land will increase in value after the date of taking and calculate the "present
> value" of the future increase in value of the land.

¶44. In response, Dedeaux cites the pretrial order of the trial court which stated, "[t]he

[c]ourt is of the opinion that the methodology used by [Elliott] as to future revenues and

future [CIAC] [is] in accordance with accepted methods of evaluation of a utility business

. . . ." According to Dedeaux, Elliott's intangible-asset valuation was consistent with *Nichols*

*on Eminent Domain* and **Bear Creek**, and was the same approach that Elliott had used in

previous public-utility valuations. Moreover, Dedeaux contends that future CIAC was "a

significant source of income" as "the installation of new subdivisions in Dedeaux's service

area in 1996 was on-going at a 'relatively rapid pace' and had been on-going for years."[16]

¶45. In **Bear Creek**, the Town of Madison, following annexation, "petitioned to condemn

a portion of a certificate of public convenience and necessity held by" Bear Creek Water

Association ("Bear Creek"), a "non-profit corporation" authorized "to distribute water to an

---

[16]Although this Court notes that while the population in Harrison County increased
by 4.88% between 1980 and 1990, and by 14.66% between 1990 and 2000, it diminished
by 4.4% in the following ten-year period. *See* http://quickfacts.census.gov and
http://factfinder.census.gov (last visited April 4, 2011).

area of southern Madison County." **Bear Creek**, 416 So. 2d at 400. "[N]o physical facilities or other real property of Bear Creek were included in the proceedings. . . . [I]n the condemned area, Bear Creek owned only the certificate . . . granting it the right to distribute water." **Id**. But, at the time the petition was filed, a subdivision developer "had installed water distribution facilities in the condemned portion at an approximate cost of $85,000[,]" which had not yet been conveyed to Bear Creek. **Id**. Regarding "the fair market value of the portion of the certificate condemned," this Court stated that:

> it is essential . . . to examine Bear Creek's previous income, its physical assets, their proximity to the area which Bear Creek is precluded from serving, *the probability of its receiving the water facilities installed by the subdivision developer, the probability of residential growth*, and the likelihood of future revenues from the area. In other words, all of the factors that a businessman or concern would reasonably consider in determining Bear Creek's value in an open market. We think this evaluation must be determined as of the date the eminent domain petition was filed . . . .

**Id**. at 402 (emphasis added). Based thereon, this Court concluded that future CIAC, in the form of the water facilities already installed by the subdivision developer, was wrongly excluded by the trial court. *See* **id**. at 403.

¶46. This Court finds **Bear Creek** distinguishable on the issue of future CIAC. In **Bear Creek**, the water facilities already had been installed, but not yet conveyed, on the date of taking. *See* **id**. at 400. In this Court's estimation, that unique factual scenario dictated the specific reference to "the probability of [Bear Creek] receiving the water facilities installed by the subdivision developer . . . ." **Id**. at 402. Here, there is no evidence of record that any likely future CIAC comparable to that in **Bear Creek** existed on the date of taking. Dedeaux's attempt to expand **Bear Creek**'s general reference to "the likelihood of

28

expansion" and "the probability of residential growth" to include the consideration of future CIAC is unsupported by any authority. Since Elliott's testimony on future CIAC was based only upon his "professional judgment," without reference to recognized authority, this Court finds it too speculative to constitute a valid consideration in intangible-asset valuation. Therefore, this Court concludes that the trial court abused its discretion in admitting Elliott's testimony on the present value of future CIAC. *See Pitre*, 35 So. 3d at 499; *Watts*, 990 So. 2d at 149; *Edmonds*, 955 So. 2d at 792; *McLemore*, 863 So. 2d at 36.

**II. Whether the trial court erred in denying Dedeaux's request for declaratory judgment on its inverse-condemnation claim.**

¶47. On April 30, 2008, Dedeaux filed a "Motion to Dismiss, or, Alternatively, for Declaratory Judgment on the Issue of Contributions in Aid of Construction After December 3, 1996, and Other Matters Constituting Inverse Condemnation" in the trial court.[17] The motion provided, in pertinent part, that:

> [i]f this [c]ourt does not allow future [CIAC] to be recovered as an element of damage, [Gulfport], who took control of the Dedeaux system on December 20, 2004, will be allowed to recover and receive assets of Dedeaux ([CIAC] from December 1996 to December 2004) without paying any compensation for such assets. This amounts to an inverse condemnation of Dedeaux assets.

---

[17]Inverse condemnation involves:

> an action or eminent domain proceeding initiated by the property owner, rather than the condemnor, and has been deemed to be available where private property has been actually taken for public use without formal condemnation proceedings and where it appears that there is no intention or willingness of the taker to bring such proceedings.

*Jackson Mun. Airport Auth. v. Wright*, 232 So. 2d 709, 713 (Miss. 1970) (quoting 27 Am. Jur. 2d *Eminent Domain* § 478 (1966)). The motion noted that the trial court did not rule upon the inverse-condemnation issue at the first trial.

¶48. The trial court denied Dedeaux's motion as procedurally untimely under Rule 4.03 of the Uniform Circuit and County Court Rules ("URCCC"). *See* URCCC 4.03(5.) ("[A]ll dispositive motions shall be deemed abandoned unless heard at least ten days prior to trial."). Addressing the substantive merits, the trial judge acknowledged that "the biggest problem I've always had with this case is that it got delayed[,]" but nonetheless, the trial court prohibited the introduction of any evidence of actual development after the date of taking.

¶49. As noted in paragraph 5 *supra*, following the trial court's ruling, Dedeaux filed a separate inverse-condemnation action in chancery court. According to Dedeaux, that action was premised on "Gulfport's assertion in the eminent domain action that a claim of inverse condemnation is a separate cause of action that must be initiated by the property owner and that the [trial court] lacked subject matter jurisdiction to hear Dedeaux's claim . . . ." But according to Gulfport, it "never asserted in any pleading that the [trial court] did not have jurisdiction of Dedeaux's inverse condemnation claim . . . ." As the parties do not dispute the trial court's jurisdiction over Dedeaux's inverse-condemnation claim, this Court concludes that the chancery court reached the correct result in granting Gulfport's "Motion to Dismiss." Accordingly, regarding consolidated Cause No. 2010-CA-00290-SCT, this Court affirms.

¶50. Dedeaux asserts that Mississippi Code Section 77-3-21 imposed "the responsibility to accept and maintain improvements to its water and sewer system when such work was necessary to maintain reasonably adequate service to the citizenry within Dedeaux's certificated area." *See* Miss. Code Ann. § 77-3-21 (Rev. 2009). As such, Dedeaux argues that Section 11-27-19, which provides that fair-market value is "established as of the date of

30

the filing of the complaint[,]" is "unconstitutional when applied to the condemnation of assets of a privately owned public utility because it . . . does not afford just compensation for [CIAC] that it must receive and maintain as a matter of state law *during the pendency of the eminent domain proceeding until the final judgment*." Miss. Code Ann. § 11-27-19 (Rev. 2004) (emphasis added). According to Dedeaux, settled law "must yield to Dedeaux's unassailable and fundamental constitutional right to reimbursement for assets that it must receive and maintain as a matter of state law during the pendency of the eminent domain proceeding until final judgment."

¶51. Gulfport responds that Dedeaux is procedurally barred from raising this issue. First, Gulfport argues that Dedeaux raised the constitutionality of Section 11-27-19 in its April 11, 1997, Answer to the eminent-domain petition, its July 2, 1997, Motion to Dismiss, and a pleading filed April 30, 2008, but "gave no notice to the Attorney General until it filed its appellate brief on September 30, 2009." Second, Gulfport contends that Dedeaux failed to preserve its inverse-condemnation claim for appeal because it "never made a proffer regarding the items of property donated to it after December 3, 1996, or the alleged value of any such donated property." Substantively, Gulfport maintains that, because the date of filing is the "proper date to be used in determining land values in eminent domain cases[,]" then:

> [a]ny property received by Dedeaux by donation, if any, after the date of taking could not be taken by [Gulfport] as of the filing of the eminent domain petition. If an inverse condemnation occurred relating to property donated to Dedeaux after the date of taking, it occurred in December 2004 when [Gulfport] took possession of the Dedeaux water and sewer system.

31

¶52. Preliminarily, this Court finds the trial court's denial of Dedeaux's motion on the procedural basis of Uniform Circuit and County Court Rule 4.03(5.) to be in error. The motion hearing was conducted on May 28, 2008, while trial did not commence until September 22, 2008. As such, the motion was "heard at least ten days prior to trial." URCCC 4.03(5.).

¶53. Regarding notice to the Attorney General, Mississippi Rule of Civil Procedure 24(d)(2) states that:

> [i]n any action . . . (2) for declaratory relief brought pursuant to Rule 57 in which a declaration or adjudication of the unconstitutionality of any statute of the State of Mississippi is among the relief requested, the party asserting the unconstitutionality of the statute shall notify the Attorney General of the State of Mississippi within such time as to afford him an opportunity to intervene and argue the question of constitutionality.

Miss. R. Civ. P. 24(d)(2). Mississippi Rule of Appellate Procedure 44(a) provides, in pertinent part, that:

> [i]f the validity of any statute . . . is raised in the Supreme Court . . . and the state . . . which enacted or promulgated it is not a party to the proceeding, the party raising such question shall serve a copy of its brief, which shall clearly set out the question raised, on the Attorney General . . . .

Miss. R. App. P. 44(a). "To comply with these rules, a party challenging the constitutionality of a legislative enactment must serve a copy of his or her brief on the Attorney General." *Oktibbeha County Hosp. v. Miss. State Dep't of Health*, 956 So. 2d 207, 211 (Miss. 2007). But this Court has stated further that a claim which does not seek to invalidate a statute, but only challenges the constitutionality of its application, does not require Rule 24(d)(2) notification. *See Aarco Oil & Gas Co. v. EOG Resources, Inc.*, 20 So. 3d 662, 665 (Miss. 2009).

32

¶54. This Court finds that Dedeaux does not assert that Section 11-27-19 is per se unconstitutional, but only unconstitutional as applied to privately owned, public-utility companies like itself. As such, this Court finds that no Rule 24(d)(2) notification was required. *See id*. Moreover, there is no dispute that Dedeaux provided Rule 44(a) notice to the Attorney General in its Appellant's Brief. Accordingly, this Court finds this procedural bar inapplicable.

¶55. Finally, Mississippi Rule of Evidence 103(a) provides that "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected" and an offer of proof is made. Miss. R. Evid. 103(a). But Rule 103(d) adds that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Miss. R. Evid. 103(d). Based upon the "plain error" rule, this Court finds that even in the absence of a proffer of post-eminent-domain-complaint CIAC, etc., by Dedeaux, its constitutional right to "just" or "due" compensation mandates this Court's consideration of the substantive merits of this claim.[18] U.S. Const. amend. V; Miss. Const. art. III, § 17 (1890).

¶56. "[T]his Court applies de novo review to matters regarding statutory interpretation." *Austin v. Wells*, 919 So. 2d 961, 964 (Miss. 2006) (citations omitted). Dedeaux has a constitutional right to "just" or "due" compensation. U.S. Const. amend. V; Miss. Const. art.

---

[18]According to Dedeaux, the period between December 3, 1996, and December 20, 2004, was one of "dynamic growth," as "numerous subdivisions, apartments and commercial establishments were constructed by developers within the Dedeaux certificated area, resulting in accumulation of substantial new assets by Dedeaux as [CIAC] after the date of filing of the Complaint of Eminent Domain, those assets having been valued at not less than [$1.2 million]."

III, § 17 (1890). But Section 11-27-19 clearly fixes fair-market value "as of the date of the filing of the complaint." Miss. Code Ann. § 11-27-19 (Rev. 2004). *See also Brown*, 182 So. 2d at 385-86. Moreover, in inverse-condemnation proceedings, this Court also has stated that "the amount of the compensation should be determined as of the date of taking." *Wright*, 232 So. 2d at 715.

¶57. Here, it is undisputed that between December 3, 1996, when Gulfport filed its complaint of eminent domain, and December 20, 2004, when Gulfport physically took over the assets and assumed operation of the utility system, Dedeaux continued to operate the utility. Under Section 77-3-21, Dedeaux had a duty to "rende[r] reasonably adequate service" during this period. Miss. Code Ann. § 77-3-21 (Rev. 2009). That statute adds:

> [i]n the event the commission finds that such utility is not rendering reasonably adequate service the commission may enter an order specifying in what particulars such utility has failed to render reasonably adequate service and order that such failure be corrected within a reasonable time, such time to be fixed in such order. If the utility so ordered to correct such a failure fails to comply . . . *its certificate for the area affected may be revoked and cancelled by the commission*.

*Id*. (emphasis added).

¶58. Fair-market value "is 'not an absolute standard nor an exclusive method of valuation.' . . . The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness . . . as it does from technical concepts of property law." *United States v. Fuller*, 409 U.S. 488, 490, 93 S. Ct. 801, 803, 35 L. Ed. 2d 16 (1973) (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 633, 81 S. Ct. 784, 790, 5 L. Ed. 2d 838 (1961)). As such, "[c]ourts have had to adopt working rules in order to do substantial justice in eminent domain proceedings." *Fuller*, 409 U.S. at 492 (quoting *Miller*,

34

317 U.S. at 375). In one such case, the Illinois Supreme Court addressed a situation where statutory law required "the value of condemned property [to be] fixed as of the date the condemnation is filed, but . . . being a public utility [the water company] is required by the Illinois Commerce Commission to expend thousands of dollars for extending and improving its service subsequent to said filing date." ***Ill. Cities Water Co. v. City of Mt. Vernon***, 144 N.E.2d 729, 731 (Ill. 1957). According to that court:

> *[t]he whole purpose of the condemnation proceeding is to satisfy the constitutional and statutory requirements that property not be taken without due process of law and that just compensation be awarded therefor. . . .* As long as rules of law meet these constitutional tests they are of value and should be sustained, but this does not mean they are without exception.
>
> . . .
>
> We believe the present situation is exceptional and that the value of all waterworks property, including that necessarily added subsequent to the date the condemnation petition is filed, may be determined in an eminent domain proceeding. Here we are not dealing solely with real estate which may be accurately described and inventoried at the time the petition is filed but largely with machinery, trucks, supplies, equipment, and other personal property, *the number and description of which will change until such time as the transfer of ownership is accomplished. We must consider too that in order to comply with its certificate of convenience and necessity, [the water company] must constantly extend its service to those who need it.* Because of these circumstances the ordinary rules of valuation must also change so as to put the [water company] in as good a financial condition after the transfer as it was before. Nothing short of such an amount conforms to the constitutional requirement of just compensation. . . . *It is our opinion that . . . the jury may consider not only the value of the property at the time the petition was filed but also the worth of all extensions, additions, and improvements of the waterworks property which were necessarily and in good faith subsequently made or commenced by [the water company] in accordance with its operating authority*.

***Id***. at 731-32 (emphasis added). *See also* ***Citizens Utils. Co. v. Superior Court***, 382 P.2d 356, 361-62 (Cal. 1963) ("it would be unconstitutional to take a utility's property valued as

35

of the date of the summons . . . without compensating it for involuntary and compulsory improvements installed by it after such date that result in an increase of value of the system."); *Iowa Elec. Light & Power Co. v. City of Fairmont*, 67 N.W.2d 41, 47 (Minn. 1954) ("[T]he gas company should be properly compensated for any such betterments, extensions, or improvements it was required to make after the award was made but before relinquishing possession of the property, subject to setoffs arising out of its continued use of the property during that time."); *Ariz. Corp. Comm'n v. Tucson Gas, Elec. Light & Power Co.*, 189 P.2d 907, 911 (Ariz. 1948) ("the condemnation statute, as a whole, is wholly inadequate, inappropriate, inapplicable, and insufficient as a means of assessing the compensation to be paid to a public utility for its physical properties and additions thereto made under compulsion of law"); *Passaic Consol. Water Co. v. McCutcheon*, 105 N.J.L. 437, 144 A. 571, 573 (N.J. Err. & App. 1929) ("[F]ailure to provide a method by which the owner can be reimbursed for the extension and betterments it is obliged to make during the pendency of the proceedings is a serious matter, and deprives the water company of just compensation for its property if the statute cannot be so construed as to include such payments.").

¶59. It is undisputed that Dedeaux operated the utility between December 3, 1996, and December 20, 2004. During this period, Dedeaux had a statutory duty to "rende[r] reasonably adequate service . . . ." Miss. Code Ann. § 77-3-21 (Rev. 2009). As such, in the interest of doing "substantial justice" in the eminent-domain proceeding so as to provide Dedeaux with its constitutional right to just compensation, this Court finds that the "ordinary rules of valuation must . . . change . . . ." *Fuller*, 409 U.S. at 492; *Ill. Cities Water Co.*, 144

36

N.E.2d at 731-32.  In short, regarding privately owned, public-utility companies, fair-market value shall not be limited to the date of taking.  Rather, in these specific cases, the applicable date for purposes of determining due compensation is the actual date the property is transferred (here, December 20, 2004).  Therefore, Section 11-27-19 is unconstitutional as applied to privately owned, public-utility companies.  *See* Miss. Code Ann. 11-27-19 (Rev. 2004).  As the trial court held otherwise, this Court concludes that it erred.  On remand, this Court instructs the trial court that:

> the jury may consider not only the value of the property at the time the petition was filed but also the worth of all extensions, additions, and improvements of the . . . property which were necessarily and in good faith subsequently made or commenced by [Dedeaux] in accordance with its operating authority.

*Ill. Cities Water Co.*, 144 N.E.2d at 731-32.  These figures should be "subject to setoffs arising out of [Dedeaux's] continued use of the property during that time[,]" including revenues earned.  *Iowa Elec.*, 67 N.W.2d at 47.

### III.  Whether the trial court erred in excluding evidence of Gulfport using a depreciated cost methodology which included the cost of overcoming existing constraints.

¶60.    At trial, Dedeaux sought to introduce an October 1999 "Updated Evaluation of Orange Grove Utilities" by CH2MHill, an independent appraiser agreed upon by Gulfport and Orange Grove Utilities, and Gulfport's March 2000 "Comprehensive Master Plan -- Water Utilities System."   The proffered testimony of Kris Riemann, Gulfport's trial representative, and Elliott was that the "Updated Evaluation" included surface restoration costs and the "Comprehensive Master Plan" noted costs incurred in a developed area.  Elliott's proffered testimony specifically noted that the "Comprehensive Master Plan"

37

included estimated cost itemizations to overcome existing conditions within particular subdivisions, such as "[p]acked foundation materials, select soil, select sandy backfill, limestone road base restoration, two inch bituminous surface course, concrete drive or walk restoration, granular drive restoration, vegetative cover, solid sod, maintenance of traffic."

¶61. The trial court excluded the "Updated Evaluation" because it "was another eminent domain case pending at approximately the same time . . . that settled and . . . any testimony from that is not admissible . . . ." The trial court excluded the "Comprehensive Master Plan" because it was created after the date of taking.

¶62. Dedeaux asserts that the "Updated Evaluation" and "Comprehensive Master Plan" should have been admitted for purposes of impeaching "Gulfport's affirmation of the value of the Dedeaux system." Gulfport responds that the subject documents were "irrelevant," as Stokes should not "be impeached with a valuation with which he had nothing to do[,]" and cumulative because Gulfport "readily admitted that it costs more to refurbish or rebuild an existing system if the work entails tearing up and repairing streets, driveways and other existing improvements."

¶63. Regarding the "Updated Evaluation," this Court has "long held that amounts paid in settlement of eminent domain claims are not admissible to prove just compensation." *Dedeaux I*, 938 So. 2d at 845-46 (citations omitted). But the considerations involved in a presettlement appraisal (e.g., assumption of raw land or existing constraints) could be contemplated without admitting the amounts paid in settlement. In this case, however, both the "Updated Evaluation" and the "Comprehensive Master Plan" were created *after* the date that Gulfport filed its complaint of eminent domain. As such, and in light of the deferential

standard of review applied to the trial court's ruling, this Court cannot conclude that the trial court abused its discretion in excluding the "Updated Evaluation" and "Comprehensive Master Plan." *See Watts*, 990 So. 2d at 145-46.

> **IV. Whether the trial court erred in prohibiting Dedeaux from cross-examining Stokes regarding his testimony at the first trial, deemed "unreliable" in *Dedeaux I*, and other prior related opinions.**

¶64. In *Dedeaux I*, this Court held that "Stokes's testimony was not based on sufficient facts and data and was therefore unreliable. Therefore, the trial court erred in admitting that testimony." *Dedeaux I*, 938 So. 2d at 843. On November 29, 2007, Stokes authored a valuation report of the Dedeaux utility system which provided that the fair-market value of operating assets, as of December 3, 1996, was $3,500,000. This figure was based upon three separate calculations using discounted cash flow rates of 8.71% and 6.44%, resulting in figures of $2,375,968 and $3,408,463; and a depreciated replacement cost of $3,691,328. Prior to trial, the trial court determined that Stokes's valuations based upon the discounted cash-flow method were inadmissible, as that method of valuation was deemed "unreliable" in *Dedeaux I*.[19] But the trial court further determined that Stokes's depreciated replacement-cost valuation ($3,691,328) was admissible because it had "some combination of what *Bear Creek* talks about."

¶65. At trial, the trial court prohibited Dedeaux from cross-examining Stokes on his testimony from the first trial or his "opinions that the [c]ourt struck in the motion in limine hearing or the *Daubert* hearing." While general reference to "prior testimony" was

---

[19]In deposition testimony, Stokes acknowledged that the discounted cash-flow method was the same methodology he had used in the first trial.

permitted, the trial court precluded Dedeaux "from offering any testimony or argument or in any other manner mentioning or implying that this case was previously tried, appealed or reversed."

¶66.   Dedeaux argues that under the "law of the case" doctrine, Stokes should not have been permitted to testify at retrial, based upon *Dedeaux I*.  Alternatively, Dedeaux contends that it should have been permitted to "impeach [Stokes] and attack his qualifications" with *Dedeaux I*.  According to Dedeaux, by precluding this form of impeachment, Gulfport "was allowed to present [Stokes] to the jury as an undisputed expert in public utilities valuation[,]" i.e., "the jury was not allowed to hear the whole story."

¶67.   Gulfport responds that the "law of the case" doctrine is inapplicable, as Stokes "used [a] different methodology to come to different conclusions in the new trial."  Moreover, Gulfport maintains the trial court did not abuse its discretion in excluding such evidence because "[t]he danger of allowing such 'impeachment' evidence is that it puts into evidence the very testimony that the impeaching party moved to exclude."

¶68.   As previously stated, the trial court's decision to admit or exclude evidence is governed by an abuse-of-discretion standard of review.  *See Watts*, 990 So. 2d at 145-46. In making this determination, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Miss. R. Evid. 403.

¶69.   Preliminarily, this Court finds the "law of the case" doctrine inapplicable to the issue of whether Stokes should have been permitted to testify.  That doctrine provides that "[w]hatever is once established as the controlling legal rule of decision, between the same

parties in the same case, continues to be the law of the case, so long as there is a similarity of facts." *Moeller v. Am. Guar. & Liab. Ins. Co.*, 812 So. 2d 953, 960 (Miss. 2002) (citation omitted). In *Dedeaux I*, this Court did not foreclose subsequent testimony by Stokes, but simply held that Stokes's testimony at the first trial was "unreliable" as it was "not based on sufficient facts and data . . . ." *Dedeaux I*, 938 So. 2d at 843. "A new trial provides a clean slate. The issues must be retried, and the parties may thus present evidence differently." *White v. Stewman*, 932 So. 2d 27, 33 (Miss. 2006). As Stokes's testimony on retrial included the use of the depreciated replacement-cost methodology, the "law of the case" doctrine has no application thereto.

¶70. As to the trial court's decision to prohibit cross-examination specifically referencing Stokes's testimony from the first trial or those opinions which were stricken pretrial, this Court finds no abuse of discretion. Undoubtedly, the jury could have been prejudiced, confused, or misled by impeachment evidence which implicated otherwise-excluded subject matter. To avoid that risk was not "arbitrary and clearly erroneous." *Watts*, 990 So. 2d at 145-46.

> **V.  Whether the trial court erred in overruling Gulfport's objection to Elliott's testimony regarding "alternatives and substitutes."**

¶71. At trial, Elliott testified, *without objection*, that his valuation required an assumption that there was a willing buyer and a willing seller as, in eminent-domain proceedings, Gulfport is "a more than willing buyer[,]" while Dedeaux is "a less than willing seller . . . ." Thereafter, in explaining his valuation, Elliott discussed "the principle of alternatives and substitutes. In other words, does a willing buyer have an alternative or a substitute to pay

41

this type price." At this point, counsel for Gulfport objected, contending that "[h]e's talking about a buyer under compulsion." The trial judge overruled the objection, stating that Elliott would be "subject to cross-examination." Elliott subsequently testified that the condemnor "can't substitute another piece of land or another utility system for this utility system because [it] wants the hole in the donut."

¶72. Gulfport argues that Elliott's testimony was "contrary to the rule that neither the buyer [n]or seller should be considered under a compulsion." According to Gulfport, this testimony denied it a fair trial on the issue of just compensation.

¶73. Without question, fair-market value involves "the sales price that would be negotiated between knowledgeable and self-interested persons, . . . the seller being under no obligation or compulsion to sell, and the buyer being under no necessity of having the property." *Potters II*, 608 So. 2d at 1231. But public-utility properties are unique because they are so rarely "bought and sold on the open market." *City of Phoenix*, 415 P.2d at 869. Furthermore, this Court fails to discern how a discussion of "alternatives and substitutes" (or the lack thereof) equates to compulsion. One factor affecting value which any reasonable buyer or seller would consider is the nature of the property at issue. While Elliott's "to pay this type price" language is suspect, this Court cannot conclude that the trial court abused its discretion in admitting such testimony.

¶74. Moreover, even if the admission of this testimony was error, this Court finds that such error was cured by the jury instructions. Jury Instruction P-2 provided, in pertinent part, that a fair-market value determination requires "neither [party] being under duress or under any compulsion to either buy or sell . . . ." Likewise, Jury Instruction D-5 stated that a fair-

market-value determination involves "an amount that a purchaser who is willing, but not required to buy, would pay and an amount that a seller who is willing, but not required to sell, would accept." These accurate statements of the controlling law cured any purported error.

**VI. Whether the trial court erred in admitting evidence, and then erred in peremptorily instructing the jury, that the "highest and best use" of the Dedeaux utility system is as an unregulated utility.**

¶75. According to the trial judge, given the existing infrastructure, the "highest and best use" is as a utility and "[t]he only thing we're arguing about . . . is, whether or not the highest and best use is a regulated utility or an unregulated utility." The trial judge also questioned the significance of this distinction as both parties agreed that their expert's valuations of the Dedeaux utility system would remain the same, regardless of whether Dedeaux's "highest and best use" was as a regulated or unregulated utility.[20]

¶76. Elliott testified that the "highest and best use" of the Dedeaux utility system on December 3, 1996, was as an unregulated utility "incorporated into a larger system . . . ."[21] Elliott offered Gulfport as an example of a "large unregulated utility . . . ." Conversely, on cross-examination, Stokes testified that, based upon the rate differential on December 3, 1996, the "highest and best use" of the Dedeaux utility system would be as a regulated utility.

---

[20]On direct examination, Stokes entirely failed to address the distinction, stating simply that the "highest and best use" of the Dedeaux utility system on December 3, 1996, "would be as a public . . . water and sewer utility business" operating as a "going concern."

[21]According to Elliott, a larger system "reduce[s] your operating cost . . . through economies of scale."

Stokes added, and Elliott conceded, that "as long as [Dedeaux] owns those assets and operates that system it's going to be regulated."

¶77. The trial judge found that "the highest and best use is the most valuable use to which a property can be taken for the public use to which it could be adapted or which it could be used. It doesn't necessarily determine what it's being used for at the time of the taking." After noting that the expert valuations of the Dedeaux utility system would remain unchanged and that Stokes's testimony failed to distinguish between regulated and unregulated, the trial judge concluded that the "highest and best use" was as an unregulated utility. Jury Instruction D-1 provided, in pertinent part, that "it would be your duty to determine the fair market value of [Dedeaux] as a going business concern as of the date of taking by [Gulfport] on December 3, 1996, *as if the buyer was an unregulated utility*." (Emphasis added.)

¶78. Gulfport argues that, because Elliott acknowledged that "as long as [Dedeaux] owned the system it was not reasonably probable that the system would be incorporated into a much larger, unregulated publicly owned utility[,]" the trial court erred in permitting Elliott to testify that such would be the "highest and best use," since Dedeaux "is not entitled to be paid . . . for any value attributable [to] the benefit [gained by Gulfport] by acquiring the utility system."

¶79. In determining fair-market value, Dedeaux is not entitled to any gain which may accrue to Gulfport. *See Miller*, 317 U.S. at 375 ("although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn,

44

must be excluded as an element of market value.").  But we, like the trial court, also question the significance of the regulated/unregulated distinction in this case, for there was no dispute that the "highest and best use" is as a *utility system*, and the expert valuations would remain the same regardless of whether the Dedeaux utility system was regulated or unregulated. However, as this Court reverses and remands for a new trial on other grounds, *see* Issue I.(B)(2)(ii) & (iii) and Issue II. *supra*, we instruct the trial court to avoid instructions on the "highest and best use" of the Dedeaux utility system as an unregulated utility.

### VII.  Whether the trial court erred in granting jury instructions which emphasized specific elements of damages.

¶80.    Jury Instruction C-1 directed the jury "not to single out one instruction alone as stating the law, but you must consider these instructions as a whole."  Jury Instruction D-2 provided that "the value of [Dedeaux] as a going business concern must be obtained by taking a *comprehensive view* of each and all of the elements of property, tangible and intangible, and *considering them as inseparable parts of the business entity*."  (Emphasis added.)  Several jury instructions noted specific valuation elements which could be considered in determining the fair-market value of the Dedeaux utility system.  Jury Instruction D-6a provided that the depreciated replacement cost:

> may include the cost which may be incurred to overcome the constraints which existed upon the property at that date, . . . in the event you find from a preponderance of the evidence that a "willing purchaser" and "willing seller" would consider those costs to be a part of the "fair market value" . . . .

Jury Instruction D-7 stated that:

> in determining your award, you may consider evidence of damages, if any, as established by a preponderance of the evidence, as follows: . . .

45

1. The fair market value of all tangible assets as measured by the depreciated replacement cost of all water and sewer facilities owned by [Dedeaux] on the date of taking . . . .

2. . . . [I]n determining the fair market value of the [Certificate], . . . you may consider the present worth of future benefits from the ownership of the Certificate as established by a preponderance of the evidence and in determining [such], if any, you may consider the following: . . .

      A. The present worth of any future [CIAC] which [Dedeaux] could have reasonably expected to receive . . . after December 3, 1996 . . . .[22]

      B. The present worth of any projected future [c]ash [f]low . . . which [Dedeaux] could have reasonably expected to receive after December 3, 1996 . . . .

3. The fair market value of land necessary for use in connection with [Dedeaux] which is stipulated to be $20,200 . . . .

4. Any other business factors which a willing buyer and willing seller could be reasonably expected to consider in the determination of the fair market value of [Dedeaux] as a going business concern including its assets, as of December 3, 1996, including but not limited to the likelihood of expansion and the likelihood of future revenue.

¶81. Gulfport argues that it was "not proper for the [c]ourt to instruct the jury regarding separate elements of damages[,]" and that the "cumulative adverse effect" therefrom "was not cured by" Jury Instruction C-1.

¶82. If the jury instructions, "read as a whole[,] . . . fairly announce the law of the case and create no injustice, no reversible error will be found." *Fielder*, 757 So. 2d at 929. This Court finds that these instructions are neither cumulative nor repetitive, for they do not seek

---

[22]As noted in Issue I.(B)(2)(iii) *supra*, evidence regarding the present value of future CIAC should be excluded and ought not be considered by the jury in determining fair-market value.

to amass or multiply the damages sought. As this Court reverses and remands for a new trial on other grounds, *see* Issue I.(B)(2)(ii) & (iii) and Issue II. *supra*, we instruct the trial court to ensure that all instructions regarding damages are sufficiently clear to prevent cumulative recovery for the same element of damages.

### VIII. Whether the trial court erred in overruling Dedeaux's objection to Gulfport's closing argument.

¶83. On direct examination, Stokes testified that his total valuation of $3,691,328 constituted a cash payment from which Dedeaux would earn $237,000 annually if invested at a 6.44% rate, well above the $25,000 in annual lost profit which Dedeaux would suffer. Dedeaux objected, the trial court sustained the objection, and the jury was instructed to disregard this testimony as irrelevant.

¶84. Nonetheless, in closing argument, counsel for Gulfport stated:

> we're exchanging . . . $3,600,000 for the assets. It's not like . . . [Gulfport] is not giving them anything. And ladies and gentlemen, if the Dedeaux people want to go squander that money that's fine. . . . They don't have to invest it *where they could earn a lot more than $25,000 a year. . . .* That's what they were earning off those assets.

(Emphasis added.) Counsel for Dedeaux objected, maintaining that "he's arguing a methodology which is not used in this case." The trial judge overruled the objection, in spite of his earlier ruling, stating that "the jury has heard the facts. They can determine for themselves." Counsel for Gulfport then added, "[a]t $25,000 a year I think I wrote down about 140 years for them to get $3.6 million."

¶85. Dedeaux contends that the trial court's decision to overrule the closing argument objection was erroneous, as it was contrary to the earlier ruling "that the investment value

47

of cash paid for the assets was irrelevant[;]" effectively authorized a "methodology for determining value . . . contrary to jury instructions[;]" and the argument itself "invoked the regulated income approach, which had been the primary basis for reversal in *Dedeaux I* . . . ."

¶86.   Based upon the trial court's ruling that Stokes's testimony on investment return was irrelevant and to be disregarded by the jury, this Court finds that the closing argument of counsel for Gulfport was not based upon admissible evidence. *See Eckman v. Moore*, 876 So. 2d 975, 986 (Miss. 2004) (quoting *Clemons v. State*, 320 So. 2d 368, 371 (Miss. 1975)) (when counsel "departs entirely from the evidence in his argument, or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence, the trial judge should intervene to prevent an unfair argument."). Thus, the trial court erred in overruling Dedeaux's objection to Gulfport's closing argument.

### IX.   Whether the trial court erred in denying Dedeaux's request for declaratory judgment on its equal-protection claim.

¶87.   On April 30, 2008, Dedeaux filed a "Combined Motion to Dismiss on Grounds of Unequal Protection" asserting that Gulfport had treated Dedeaux "substantially different[ly] than similarly situated utility companies in determining just compensation after exercising its power of eminent domain . . . ."[23] *Dedeaux I* provided that "Gulfport paid Orange Grove $33,800,000 ($3,157.40 per customer for 10,705 customers) for its property and offered

---

[23]The motion noted that the trial court did not rule upon the equal-protection issue at the first trial. *See Dedeaux I*, 938 So. 2d at 845.

Dedeaux only $2,140,000 ($773.63 per customer for 2,763 customers)." *Dedeaux I*, 938 So. 2d at 845. In support of the motion, Elliott provided an affidavit that on December 3, 1996, the water and sewer systems of Dedeaux and Orange Grove Utilities were "very similar" in that "both . . . were designed to suburban utility system standards." The motion also included the pre-first trial hearing testimony of Samuel Albritton, a former Gulfport councilman, "which indicated that the disparity of treatment between Dedeaux and Orange Grove was based on political reasons, i.e., spending as much money on Dedeaux as they spent on Orange Grove would have lessened city officials' chances of being re-elected." *Id*.

¶88. The trial court denied Dedeaux's motion as procedurally untimely under Uniform Circuit and County Court Rule 4.03,[24] yet also substantively found "glaring differences" between Dedeaux and Orange Grove Utilities. According to the trial judge, Orange Grove Utilities serves nearly four times more customers, covers a "somewhat different" area, and there was no agreement by Gulfport to treat the utilities the same. In sum, the trial judge stated that "[t]here's just too many differences for the [c]ourt to believe that" the differential in payment-per-customer "alone is a violation under . . . the equal protection clause . . . ."

¶89. This Court has stated that "[a] state may confer benefits on some and not others under equal protection, 'so long as its decision is rational.'" *Mosby v. Moore*, 716 So. 2d 551, 555 (Miss. 1988) (quoting *Westbrook v. City of Jackson*, 665 So. 2d 833, 838 (Miss. 1995)). "[P]rotecting the public treasury is a legitimate legislative purpose." *Mosby*, 716 So. 2d at

---

[24]This Court rejects the procedural basis for the trial court's ruling, as the motion hearing on May 28, 2008, was "at least ten days prior to trial[,]" which commenced on September 22, 2008. URCCC 4.03(5).

556 (citation omitted). While the difference in proposed payment-per-customer by Gulfport to Dedeaux and Orange Grove Utilities might seem significant, in light of the noted differences between those utilities, this Court cannot conclude that the trial court erred in denying Dedeaux's equal-protection claim. Accordingly, this issue is without merit.

### X. Whether the trial court erred in denying Gulfport's "Motion to Recover Excess Interest."

¶90. Following *Dedeaux I*, Gulfport filed a "Motion to Recover Excess Interest," arguing that, because this Court "reversed the [c]ourt's order requiring the interest to be compounded[,]" Gulfport "is entitled to have a judgment entered against Dedeaux for the excess interest paid to Dedeaux *along with interest on that amount at the rate of 8% simple interest until paid*." *See Dedeaux I*, 938 So. 2d at 846 (emphasis added). At the subsequent motion hearing, counsel for Gulfport contended that "[w]e paid them that $700,000. They had it all this time. They've used it, they've earned interest on it. I think it's only fair . . . that [Gulfport] be paid interest on that amount from the date it was paid[,] . . . something like December 14, 2004." The trial court granted Gulfport recovery of the $698,604.86 in compounded interest, but denied Gulfport's request for "interest on the overpayment to Dedeaux . . . ." According to the trial court's order:

> there are no applicable cases ruling on the overpayment of interest after trial[,]
> . . . the Supreme Court [in *Dedeaux I*] only required the return of the
> overpayment by [Gulfport] and does not require the payment of interest for the
> period of time that [Dedeaux] had the interest pursuant to the prior [o]rder of
> the [c]ourt.

¶91. On appeal, Gulfport contends that fairness dictates that the return of $698,604.86 in compounded interest is "a judgment . . . to which [Mississippi Code Section] 75-17-7 is

50

applicable." Dedeaux responds that Section 75-17-7 is "inapplicable to this eminent domain action," as "[n]othing in the eminent domain statutory scheme allows interest to be awarded to the condemnor." Moreover, Dedeaux maintains that even if Section 75-17-7 were applicable, "there has been no 'judgment' for which interest can be awarded" pursuant to that statute.

¶92. The standard of review for the grant or denial of interest remedies is abuse of discretion. *See* ***Cash Distributing Co., Inc. v. Neely***, 947 So. 2d 317, 326 (Miss. Ct. App. 2006). ***Dedeaux I*** specifically stated that Section 75-17-7 did not apply to eminent-domain judgments "[b]ecause the eminent domain statutory scheme has a specific provision for interest on eminent domain judgments" in Section 11-27-19. ***Dedeaux I***, 938 So. 2d at 846. Section 11-27-19 provides only that "[a]ny judgment finally entered *in payment for property to be taken* shall provide legal interest *on the award of the jury* from the date of the filing of the complaint until payment is actually made . . . ." Miss. Code Ann. § 11-27-19 (Rev. 2004) (emphasis added). This provision is clearly inapplicable to Gulfport's request for interest on the overpayment. Therefore, this Court concludes that the trial court did not abuse its discretion in denying Gulfport's "Motion to Recover Excess Interest," insofar as Gulfport sought interest on the overpayment.

**XI. Whether the trial court erred in denying Gulfport's "Motion to Reconsider Change of Venue."**

51

¶93. On December 15, 2003, the trial court granted Dedeaux's "Motion for Change of Venue," transferring the case from the First Judicial District to the Second Judicial District.[25] In *Dedeaux I*, this Court found that Gulfport's appellate challenge to the trial court's decision to grant Dedeaux's "Motion for Change of Venue" was "procedurally barred" because it was raised "for the first time on appeal . . . ." *Dedeaux I*, 938 So. 2d at 846. On April 2, 2008, Gulfport filed a "Motion to Reconsider Change of Venue,"[26] contending, *inter alia*, that "[t]he court does not have the authority to transfer jurisdiction in an eminent domain case because the venue statute in eminent domain is jurisdictional."

¶94. At the motion hearing, the trial judge stated that he had granted the "Motion for Change of Venue" to the Second Judicial District "so we didn't have a problem selecting the jury that would have any conflict at all by living in the utility districts whether it's being run by Dedeaux or Gulfport." The trial judge added that "for practical purposes we're still in Harrison County." Thereafter, the trial court denied Gulfport's "Motion to Reconsider Change of Venue."

¶95. Gulfport argues that "[w]hen a statute provides for only one county of venue, venue then is jurisdictional." Gulfport maintains that, under Mississippi Code Section 11-27-5, "[t]he only court with jurisdiction over eminent domain proceedings is the Special Court of Eminent Domain of the [c]ounty in which the land is situated." *See* Miss. Code Ann. § 11-27-5 (Rev. 2004). Since Harrison County has two judicial districts which are treated by

[25]The trial court reasoned that jury selection in the First Judicial District may be hindered by the number of potential jurors who were, or might be, Dedeaux customers.

[26]At the hearing on this motion, counsel for Gulfport admitted that the motion was "technically . . . for relief from [o]rder or [j]udgment in Rule 60."

statute as "two separate counties[,]" Gulfport contends that "[t]he [t]rial [c]ourt's order transferring the venue of this case from the First Judicial District . . . to the Second Judicial District equated to transferring the case to another . . . county." *See* Miss. Code Ann. § 11-1-53 (Rev. 2002). Gulfport adds that, despite the delay in presenting its "Motion to Reconsider Change of Venue," it is not procedurally barred, because subject-matter jurisdiction "cannot be conferred . . . or waived by the parties."

¶96.   Procedurally, Dedeaux responds that Gulfport's "Motion to Reconsider Change of Venue," filed more than four years after the "Motion for Change of Venue" was granted in December 2003, is "time-barred." Substantively, Dedeaux asserts that Mississippi Code Section 11-27-5 is "silent with respect to the propriety of a subsequent transfer of the case to a different venue in the event that a party cannot secure a fair trial in the county in which the affected property is situated."

¶97.   The standard of review for the grant or denial of a motion for change of venue is abuse of discretion. *See **Bayer Corp. v. Reed***, 932 So. 2d 786, 788 (Miss. 2006); ***Donald v. Amoco Prod. Co.***, 735 So. 2d 161, 181 (Miss. 1999); ***Miss. State Highway Comm'n v. Rogers***, 240 Miss. 529, 539-40, 128 So. 2d 353, 358 (1961). Likewise, the standard of review for the denial of a Rule 60 motion is abuse of discretion. *See **Perkins v. Perkins***, 787 So. 2d 1256, 1261 (Miss. 2001).

¶98.   Procedurally, this Court notes that Rule 60(c) states:

> [a]n order transferring a case to another court will become effective ten (10) days following the date of entry of the order. Any motion for reconsideration of the transfer order must be filed prior to the expiration of the 10-day period, for which no extensions may be granted.

Miss. R. Civ. P. 60(c). Gulfport clearly failed to comply with this rule. Furthermore, *Dedeaux I* concluded that Gulfport's challenge to the trial court's granted change of venue was "procedurally barred." *Dedeaux I*, 938 So. 2d at 841. But this Court also has stated that a new trial "provides a clean slate. The issues must be retried, and the parties may thus present evidence differently. As such, a new trial requires its own law, and the judge is once again empowered to make judgments concerning Mississippi law as required by the evidence." *White*, 932 So. 2d at 33. Based thereon, this Court will proceed to the substantive analysis.

¶99. Mississippi Code Section 11-27-5 provides, in pertinent part, that "[a]ny person or corporation having the right to condemn private property for public use shall file a complaint to condemn with the circuit clerk of *the county in which the affected property, or some part thereof, is situated* . . . ." Miss. Code Ann. § 11-27-5 (Rev. 2004) (emphasis added). Gulfport's complaint of eminent domain was filed in the First Judicial District. But since the "affected property . . . is situated" in Harrison County, that complaint also could have been filed in the Second Judicial District. *Id*. Unquestionably, Mississippi Code Section 11-1-53 provides that Harrison County is "a county having two (2) judicial districts," that "the jurisdiction of said courts of said districts shall be the same as if each district were a separate county[,]" and that "a change of venue from either of such districts to the other . . . shall be made according to the procedure provided for by the Mississippi Rules of Civil Procedure . . . ." Miss. Code Ann. § 11-1-53 (Rev. 2002). For purposes of Section 11-27-5, however, this Court concludes that either the First Judicial District or the Second Judicial District could have had jurisdiction of this case. Moreover, Section 11-27-5 does not prohibit change of

54

venue. In fact, this Court previously has held a lower court in error for refusing to grant a motion for change of venue in an eminent-domain proceeding. *See **Rogers***, 128 So. 2d at 357-58. Under these circumstances, i.e., remaining in Harrison County and the trial court's sound rationale for granting change of venue, this Court cannot conclude that the trial court abused its discretion in denying Gulfport's "Motion to Reconsider Change of Venue."

**CONCLUSION**

¶100. On direct appeal in Cause No. 2008-CA-02105-SCT, this Court affirms the Special Court of Eminent Domain, Harrison County, Mississippi, Second Judicial District, as to (1) qualifying Alexander and Stokes as experts; (2) admitting expert testimony on tangible-asset valuation which was based upon assumptions of both raw land and existing constraints; (3) excluding the October 1999 "Updated Evaluation of Orange Grove Utilities" and Gulfport's March 2000 "Comprehensive Master Plan -- Water Utilities System" as evidence of Gulfport considering the cost of overcoming existing constraints in other contexts; (4) prohibiting the cross-examination of Stokes regarding his expert testimony at the first trial and other prior related opinions; and (5) denying Dedeaux's "Combined Motion to Dismiss on Grounds of Unequal Protection." On direct appeal in Cause No. 2008-CA-02105-SCT, this Court reverses the trial court and remands for a new trial regarding its (1) admission of the expert testimony of Stokes regarding the present value of future cash flow and (2) denial of Dedeaux's "Motion for Declaratory Judgment on the Issue of Contributions in Aid of Construction After December 3, 1996, and Other Matters Concerning Inverse Condemnation," which thereby limited the jury's consideration of fair-market value to the date that Gulfport's complaint of eminent domain was filed. Instead, in cases involving

55

privately owned, public-utility companies, the applicable date for determining due compensation is the actual date the property is transferred. Furthermore, as the parties do not dispute the trial court's jurisdiction over Dedeaux's inverse-condemnation claim, this Court affirms the "Motion to Dismiss" entered by the Chancery Court of Harrison County, Mississippi, First Judicial District, in Cause No. 2010-CA-00290-SCT.

¶101. On cross-appeal in Cause No. 2008-CA-02105-SCT, this Court affirms the Special Court of Eminent Domain, Harrison County, Mississippi, Second Judicial District, as to (1) admitting Elliott's use of fifteen-year estimates regarding the present value of future cash flow; (2) admitting Elliott's expert testimony regarding the present value of future cash flow; (3) overruling Gulfport's objection to Elliott's expert testimony regarding "alternatives and substitutes;" (4) granting jury instructions addressing specific elements of damages; (5) denying Gulfport's "Motion to Recover Excess Interest;" and (6) denying Gulfport's "Motion to Reconsider Change of Venue." On cross-appeal in Cause No. 2008-CA-02105-SCT, this Court reverses the trial court and remands for a new trial regarding its admission of Elliott's expert testimony on the present value of future CIAC.

¶102. On remand, this Court further instructs the trial court that, during the new trial, it should avoid, if necessary, (1) instructions on the "highest and best use" of the Dedeaux utility system as an unregulated utility and (2) permitting closing-argument reference to potential investment return on the jury verdict for Dedeaux.

¶103. **AS TO 2008-CA-02105-SCT: ON DIRECT APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

> **AS TO 2010-CA-00290-SCT:    AFFIRMED.**

56

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**